MALONEY, APPELLEE, *v.* RHODES, GOVERNOR, ET AL.,
APPELLEES; OCASEK ET AL., APPELLANTS.

[Cite as Maloney v. Rhodes (1976), 45 Ohio St. 2d 319.]

(No. 75-1049—Decided March 19, 1976.)

*Messrs. Brownfield, Kosydar, Bowen, Bally & Sturtz* and *Mr. C. William Brownfield*, for plaintiff-appellee.

*Messrs. Crabbe, Brown, Jones, Potts & Schmidt, Mr. William L. Schmidt* and *Mr. Ira O. Kane*, for defendant-appellees.

*Mr. William J. Brown*, attorney general, *Mrs. Maryann B. Gall* and *Mr. Peter D. Kinder*, for appellants.

O'NEILL, C. J.   The first question presented for determination may be stated thus: Is the Secretary of State constitutionally obligated to file a law passed by both Houses of the General Assembly and signed by the Speaker of the House and the Governor of the state when it is properly delivered to him for filing?

The answer to that question is, "yes."

The judgment of the Court of Common Pleas reads, in part, as follows:

"2. The court further finds * * * that Amended House Bills Nos. 18 and 44; Substitute House Bill No. 43, and the Amended Senate Bills Nos. 3, 4 and 5 are incomplete legislation and ineligible for filing with the Ohio Secretary of State;

"3. The court further finds that James A. Rhodes, Governor of Ohio, and his successors, agents and employees should be and they hereby are permanently enjoined from signing and/or filing with the office of the Secretary of State any or all of laws aforesaid * * * and that Ted W. Brown, Secretary of State, and his successors, agents and employees, should be and they hereby are permanently enjoined from accepting for filing any of the said laws."

That judgment was affirmed by the Court of Appeals by judgment entry as follows:

" * * * it is the judgment and order of this court that the judgment of the Common Pleas Court of Franklin County, Ohio is affirmed."

In the instant cause, Governor Gilligan signed the bills and, under the Constitution, was required to file them with the Secretary of State, which he attempted to do. Under the Constitution, the Secretary of State was required to file them, which he refused to do on the ground that they were invalid because they did not contain the signature of the President of the Senate, which is a judicial decision.

The plain provisions of Section 16, Article II state:

"*If the Governor approves an act, he shall sign it, it becomes law and he shall file it with the Secretary of State.*

"If he does not approve it, he shall return it with his objections in writing, to the house in which it originated * * *.

"If a bill is not returned by the Governor within ten days, Sundays excepted, after being presented to him, *it becomes law in like manner as if he had signed it,* unless the General Assembly by adjournment prevents its return; in which case, it becomes law unless, within ten days after such adjournment, *it is filed by him,* with his objections in writing, *in the office of the Secretary of State.* The *Governor shall file with the Secretary of State every bill not returned by him to the house of origin that becomes law without his signature.*" (Emphasis added.)

The language of Section 16, Article II of the Constitution is unmistakably clear.

The Secretary of State has no option. The Secretary of State is obligated by the Constitution and his oath of office to file the law when it is presented to him for filing. It is a ministerial act. It is not discretionary. *State, ex rel. Marcolin,* v. *Smith, Secy. of State* (1922), 105 Ohio St. 570. In the opinion *by the court,* it is stated, at page 572, as follows:

"It has thus become the established law of this state that no officer or tribunal may interfere either with the enactment of laws or the amendment of the constitution while the same is in process, upon the ground that such legislation, if enacted, or constitutional amendment, if adopted, will be in conflict with the constitution, state or federal. These questions are and must necessarily be reserved for consideration and determination after the legislative or constitution-making body shall have fully performed its function and such new law or constitutional amendment *shall have become effective.*" (Emphasis added.)

The controlling rule of law on the issue in the instant case is succinctly stated in *State, ex rel. Marcolin,* v. *Smith, Secy. of State, supra,* at page 590, by Wanamaker, J., in his concurring opinion, in the following language:

"Under the constitution the secretary of state is made

an executive officer. The question of constitutionality, which the minority seek to raise and decide, certainly is of a judicial character, not executive. The secretary of state is not vested with any jurisdiction to determine judicial questions dealing with the constitutionality of any law. His duties are merely ministerial in this respect, not discretionary.''

''Ministerial act'' is defined in Black's Law Dictionary (4 Ed.), at page 1148, as follows:

''One which a person performs in a given state of facts in a prescribed manner in obedience to the mandate of legal authority, without regard to or the exercise of his own judgment upon the propriety of the act being done.''

The Ohio Constitution, Section 1 of Article III, in pertinent part, provides:

''The executive department shall consist of a Governor * * * Secretary of State * * *.''

The Secretary of State has no judicial power, authority or jurisdiction to declare a law constitutionally invalid or to refuse to file it. Mandamus will lie to compel him to perform the official act of accepting and filing the law. Section 16, Article II, Ohio Constitution. *State, ex rel. Pressley,* v. *Indus. Comm.* (1967), 11 Ohio St. 2d 141, paragraph one of the syllabus.

The next question to be determined is: Was Governor Rhodes constitutionally obligated to file with the Secretary of State the laws passed by both Houses of the General Assembly, signed by the Speaker of the House, and timely signed by his duly elected and qualified predecessor in the office of Governor?

The answer is, ''yes.'' Governor Rhodes was constitutionally obligated to file the laws with the Secretary of State. *State, ex rel. Marcolin,* v. *Smith, supra.*

The language of the Constitution is unmistakably clear that the Governor, who is the head of the executive department of government, Section 1, Article III, Ohio. Constitution, has but three options with regard to bills sent to him for signature. (1) He may sign if he approves the bill, in which case he is required to file the law with the Secretary of

State; (2) he may veto if he disapproves the bill, in which case he is required to return it with his objections to the house of the General Assembly in which it originated; (3) he may refuse to sign or veto the bill, in which case at the end of ten days after the bill was presented to him it becomes law (unless the General Assembly adjourns within the ten day period) and he is required to file it with the Secretary of State. If the General Assembly adjourns within the ten day period, it becomes law unless the Governor, within ten days of the adjournment, files it with his objections in writing in the office of the Secretary of State. The Governor is required to file with the Secretary of State every bill which becomes law without his signature.

The Governor has no judicial power, authority or jurisdiction to declare a bill constitutionally invalid and hold possession of it. He has only the executive power to sign, veto, or refuse to sign or veto, and the constitutional obligation to file the law or bill either with the Secretary of State or the house where the bill originated. *State, ex rel. Marcolin, v. Smith, supra.*

A successor Governor is constitutionally obligated to present to the Secretary of State a law timely signed by his duly elected and qualified predecessor.

To hold otherwise would violate the Constitution and the oaths of office of both the Governor and the Secretary of State.

If the Governor or the Secretary of State is authorized to exercise the judicial power to summarily declare a law unconstitutional, chaos will ensue. An attack upon the constitutional validity of a law must be made in a proper court. The judicial power to declare a law unconstitutional is exclusively within the judicial branch of government.

In the instant cause, Governor Gilligan signed the bills and, under the Constitution, was required to file them with the Secretary of State, which he attempted to do. Under the Constitution, the Secretary of State was required to file them, which he refused to do on the ground that they were invalid because they did not contain the signature of the President of the Senate, which is a judicial

decision. Governor Rhodes, when he received them from the Secretary of State, declined to file them as required by the Constitution for the same reason and kept possession of them, which is a judicial decision as to the validity of the laws.

The Court of Common Pleas should have denied the injunction and ordered the Governor to file the laws with the Secretary of State and ordered the Secretary of State to accept and file the laws. The Court of Common Pleas could then have issued an order staying the effect of the laws until the court had determined their constitutional validity.

The Court of Appeals should have reversed the judgment of the Court of Common Pleas issuing the injunction and ordered the Governor to file the laws with the Secretary of State and the Secretary of State to accept and file them. The Court of Appeals could then have issued an order staying the effect of the laws until their constitutional validity was determined by that court.

The next question to be determined is: Are the laws, enacted by the passage by the General Assembly of the six bills with which the court is concerned in this case and the affixing of the Governor's signature to each bill, constitutionally invalid because the mandatory signature-certification, by the President of the Senate, that the "procedural requirements for passage have been met," as required by Section 15(E) of Article II of the Constitution does not appear on any bill?

The appellants contend that the issue is whether the six laws passed by the General Assembly are invalid because they lack the Lieutenant Governor's signature.

That statement of position is not quite accurate because it is the signature-*certification* by the Lieutenant Governor as the President of the Senate that is required by the Constitution.

The law on the constitutional requirement of a certification has been settled in this state since 1887. *State* v. *Kiesewetter* (1887), 45 Ohio St. 254; *Ritzman* v. *Campbell* (1915), 93 Ohio St. 246. The court, in the second paragraph

of the syllabus of *Kiesewetter,* stated as follows:

"The bill, not being authenticated, as required by Section 17, of Article 2 [now amended as Section 15, Article II], of the constitution, which provides that 'the presiding officer of each house shall sign, publicly in the presence of the house over which he presides, while the same is in session and capable of transacting business, all bills and joint resolutions passed by the General Assembly,' did not become a law."

It should be noted that in 1887 the Governor had no authority to sign or veto an act passed by the General Assembly.

The appellants rely heavily for support of their position upon the Ohio Constitutional Revision Commission, Recommendations for Amendments to the Ohio Constitution, Part I, Administration, Organization and Procedures of the General Assembly (1971). However, in the discussion comparing Section 15(E) of Article II, adopted May 8, 1973, with its predecessor, Section 17 of Article II, it is stated, under the heading Intent of Commission, at page 48:

" * * * The presiding officer will be able to sign bills in his office instead of being required to sign them in chamber. From a practical standpoint, this is the only major change foreseen."

The appellants contend that Section 15(E), Article II of the Ohio Constitution is a directory provision, and that the presence or absence of the Lieutenant Governor's signature affects the law's validity not in the least.

Appellants, in support of their position that the six laws are not invalid because they lack the President of the Senate's signature, argue that the only purpose of the signature requirement is to inform the Governor that in each house the bill received three readings* and passed by a constitutional majority.

That position is untenable. Section 15(E) requires a

---

*Section 15(C), Article II, requires that "every bill shall be considered by each house on three different days * * * ." There is dispute in the record as to whether this requirement was met.

certification that the procedural requirements for passage have been met. There is no basis for the argument that the only purpose to be served by the signature-certification is to so inform the Governor, other than the language which says that when the certification has been made the bill shall be presented forthwith to the Governor for his approval. Appellants argue that nothing more can be done by the General Assembly with regard to the bill and, therefore, the certification is to inform the governor exclusively. Not so.

The temporary rules of the Senate, Ohio Senate Journal, January 6, 1975, Rule 68, page 20, provide for a motion to reconsider to be made only by a Senator who voted with the prevailing side, which motion must be made within the next two legislative days of the Senate after the vote on the bill was taken. There is a similar rule in the House. In this case that means that since all six bills were passed in the houses on Friday, January 10, if the clerk had presented the bills to the President of the Senate on January 11, the day the Governor received them for his signature, and the President of the Senate had discovered an error in the procedures with regard to the passage of one of the bills and called it to the attention of the membership of the house in which it passed on January 10, the bill could have been reconsidered that day (January 11) and the procedure corrected. This has happened on infrequent occasions in the General Assembly.

There is no merit in the appellants' contention that the certification by the President of the Senate is limited to procedural requirements for passage set forth in the Constitution. Again, the appellants rely for this position exclusively upon the report of the Constitutional Revision Commission. However, the words of the Constitution itself control (see *State, ex rel. Wallace,* v. *Celina* [1972], 29 Ohio St. 2d 109, 112), and Section 15(E) does not limit "the procedural requirements for passage" to be met to "*constitutional* procedural requirements for passage" to be met.

The reason this argument is made by appellants is that

they are attempting to establish that the President of the Senate could determine whether the constitutional procedural requirements for passage had been met without having possession of the enrolled bills. Appellants claim that this determination could be made by examining copies of the Senate Journal for the appropriate days. It is in this way that appellants attempt to justify their refusal to give the enrolled bills to the President of the Senate for his personal examination before certifying by signing that the procedural requirements for passage have been met.

It is part of the responsibility of the President of the Senate, under the settled law of this state, to examine the record in the General Assembly to determine whether the procedural requirements for passage have been met. He certifies the bills and his certification is for the information of the Governor, the information of the General Assembly and for the benefit of the public. It indicates to those who are interested whether or not the legislation has been properly passed. The public can then decide whether to contact the Governor to urge his veto or his signing of the bill.

It is clear that if the President of the Senate discovered that a procedural requirement had not been met in passage of a bill, he could call attention of the General Assembly to that fact, and if the time within which a reconsideration might be sought had not expired, the procedural defect might be corrected.

The appellants further contend that the Senate has the right and the duty, under Section 6, Article II of the Ohio Constitution, and under rules of parliamentary procedure, to protect the integrity of its processes from the nonfeasance of its presiding officers. It is asserted that the Senate may take such action without the intervention of any other branch of government.

There is no merit to that contention. Section 6, Article II of the Ohio Constitution does not so provide. An examination of the Constitution and the decided case law of this state indicates that the opposite is true. The provisions in Section 15 of Article II of the Ohio Constitution are designed expressly to guarantee the integrity of the legisla-

tive process. These provisions place a responsibility upon the presiding officer of each house to certify, by his signature, that the integrity of the legislative process has not been violated, either inadvertently or deliberately, by the members or employees responsible for seeing to it that the General Assembly adheres to the procedural requirements for passage of a bill that have been established by law.

In addition, the constitutional responsibility of the presiding officers of each house to sign a certification where all of the procedural requirements for passage have been met is a ministerial duty. It is mandatory. It can not be used as a veto power or a power with which to thwart the prompt passage of legislation. In Mason, Manual of Legislative Procedure (1970), Section 575, it is stated:

"Where a presiding officer is required to sign a bill or ordinance to authenticate its passage, the act of signing is simply ministerial and not an exercise of legislative discretion [and] therefore mandamus will lie to compel its performance. To hold otherwise would give the presiding officer, in effect, a veto upon the acts of the legislative body."

Mandamus will lie to compel the performance of this clear legal duty by a public officer. In mandamus an order may issue to a presiding officer to show cause why he has not signed. *State, ex rel. Pressley*, v. *Indus. Comm., supra* (11 Ohio St. 2d 141).

In the instant cause, the Clerk of the Senate and the leaders of the majority party were fearful that if they delivered the enrolled bills to the President of the Senate for his examination and signature-certification, as required by the Constitution, he would decline to sign, but retain possession of the enrolled bills until the term of the Governor had expired and the succeeding Governor, of a different political party, had assumed the office. This they felt would be fatal to the bills because they were fearful that the succeeding Governor would veto the bills and because the majority party lacked one vote of having sufficient members of its own party in the House of Representatives to override a veto. Thus, the focus of this case is the fear which the members of the majority party had that the President

330

of the Senate would not promptly carry out his constitutional duties to certify by signing. The constitutional and orderly way to have proceeded would have been to present the President of the Senate with the enrolled bills and if he had failed, within a reasonable time, to have examined and certified by his signature that the procedural requirements for passage of each bill had been met, to have sought a writ of mandamus in the courts to compel him to perform his constitutional duty. The majority leaders no doubt feared that all of this would take more time than was available because of the imminence of the expiration of the Governor's term of office.

The constitutional requirement for a signature-certification by the presiding officer of each house, that in the passage of a bill through the two houses of the General Assembly the procedural requirements for passage have been met, is mandatory and the absence of such a signature-certification makes the law enacted by such a bill invalid. *State* v. *Kiesewetter, supra,* paragraph two of the syllabus; *Ritzman* v. *Campbell, supra,* paragraph two of the syllabus.

Nichols, C. J., in *Ritzman, supra,* makes it clear that action in the court is the proper way to determine the validity of an act which has been passed but the presiding officer has failed to make a signed certification that the procedural requirements for passage were met, in the following language, at page 252:

"Failure to follow these mandatory provisions must invalidate acts so passed, and there being no other available tribunal, resort must be had to the courts of the state to determine the validity thereof."

The amendments which were made to Section 17 of Article II when it became Section 15, Article II, made no change in the mandatory requirement that the presiding officer of each house shall sign each bill. In fact, Section 15 is stronger in its mandatory requirement than was Section 17. Section 17 made a mandatory requirement that the presiding officer sign, while Section 15 requires that the presiding officer certify by his signature that the procedural requirements for passage have been met.

The judgment of the Court of Appeals, which affirmed the judgment of the Court of Common Pleas which "permanently enjoined" Governor James A. Rhodes "from signing and/or filing with the office of the Secretary of State any or all of laws aforesaid, to wit: Amended House Bills Nos. 18 and 44; Substitute House Bill No. 43; and Amended Senate Bills Nos. 3, 4 and 5 * * *," and permanently enjoined Ted W. Brown, Secretary of State "from accepting for filing any of the said laws," is reversed.

Governor James A. Rhodes is hereby ordered to deliver to the Secretary of State the laws which were enacted by the passage of Amended House Bills Nos. 18 and 44, and Substitute House Bill No. 43, and Amended Senate Bills Nos. 3, 4 and 5, by the required majority vote and the affixing of the Governor's signature to each such bill, and Secretary of State Ted W. Brown is hereby ordered to file such laws.

This court hereby declares constitutionally invalid each law which was enacted upon the passage of Amended House Bills Nos. 18 and 44, Substitute House Bill No. 43, and Amended Senate Bills Nos. 3, 4 and 5, by the required majority in each house of the 111th General Assembly, and the affixing of the Governor's signature to each such bill, on the ground that the constitutionally mandatory signature-certification of the presiding officer of the Senate does not appear on any of the bills "to certify that the procedural requirements have been met," as required by Section 15(E), Article II of the Ohio Constitution.

*Judgment accordingly.*

Herbert, Stern and W. Brown, JJ., concur.

Corrigan, J., concurs in part only in the judgment of affirmance.

P. Brown, J., concurs in paragraph three of the syllabus and in so much of the judgment as declares each of these laws constitutionally invalid.

Celebrezze, J., dissents.

332

Corrigan, J., concurring in part.

### I.

I concur in the result reached by the majority in this case but not in the scope of the judgment they have arrived at, nor in the opinion expressing their rationale. This conclusion is achieved for the reasons which follow.

The constitutional controversy presented to the court in this appeal, upon scrutiny of the established facts, should, in my view, be attenuated to just one significant issue, namely: Where the majority leadership of both houses of the General Assembly decides not to present, and does not present, six original enrolled bills passed by the General Assembly to the Lieutenant Governor for his signatures to certify that the procedural requirements for passage have been met, as provided by Section 15(E), Article II of the Ohio Constitution, and, for those reasons the bills are not signed by the Lieutenant Governor, then, do such bills become constitutionally invalid and, therefore, fail of enactment?

### II.

The curtain arose on an unprecedented series of events in the legislative annals of Ohio on January 6, 1975, which culminated in the legal proceedings presently before this court for decision.

On that date, the 111th Ohio General Assembly convened for the purpose of considering for passage six items of proposed legislation, three of which were to originate in the Senate and three of which were to originate in the House of Representatives. Those bills were passed in the five legislative days between Monday, January 6, and Friday, January 10, 1975, as Am. H. B. No. 18 (to require state income taxes to be paid directly to the Treasurer of State); Sub. H. B. No. 43 (to eliminate the discretionary power of the Secretary of State in the appointment of members of boards of elections and to add a ground for their removal); Am. H. B. No. 44 (to establish new districts throughout Ohio for the election of representatives to Congress); Am. S. B. No. 3 (to modify the labor dispute and extended benefits provisions of the unemployment compensation law); Am. S. B. No. 4 (to provide for mail and

house-to-house voter registration and to eliminate failure to vote as a reason for cancellation of registration); Am. S. B. No. 5 (to transfer responsibilities of the Director of Commerce under the Consumer Sales Practices Act to the Attorney General).

By virtue of the general election held throughout the state in November 1974, the Ohio Senate majority shifted, in January 1975, from that of the Republican Party to the Democratic Party. The majority in the Ohio House of Representatives remained with the Democrats. John J. Gilligan, a Democrat, continued in office as Governor until January 13, 1975, as did John W. Brown, a Republican, remain in office as Lieutenant Governor until that date. On January 13, both men were succeeded in office, by James A. Rhodes, a Republican, and Richard Celeste, a Democrat, respectively.

Thus, due further to the peculiar provisions of the Ohio Constitution, there existed a seven-day period when the newly-elected General Assembly and the soon-to-be, former Governor served concurrently. This seven-day period, in 1975, was the only portion of time during Governor Gilligan's administration when he had a Democratic majority in each house of the General Assembly.

The six bills were expedited through both houses of the General Assembly by the Democratic majority in order to try to achieve their complete enactment into law before Governor-elect Rhodes assumed office on January 13, 1975. It was feared that Governor Rhodes would veto the six bills and the Democrats did not have sufficient votes in the General Assembly to override such possible veto.

Lieutenant Governor John W. Brown, a Republican, had been defeated in the general election and would leave office on January 13, 1975. However, during the week of January 6th through January 13th, 1975, Lieutenant Governor Brown actively carried out his duties as such and was present and available to review for signature the six bills in question herein, in accordance with the provision of Section 15(E), Article II of the Ohio Constitution which reads, as follows:

"Every bill which has passed both houses of the Gen-

eral Assembly shall be signed by the presiding officer of each house to certify that the procedural requirements for passage have been met and shall be presented forthwith to the Governor for his approval.''

Lieutenant Governor Brown's presence and availability to fulfill his constitutional function in connection with the six bills was made known to the public, to the Clerk of the Senate, one William Chavanne, and to the Senate membership.

On January 11, 1975, at about 3:00 p. m., a delegation composed of several Majority Senators and the Clerk of the Senate came to Lieutenant Governor Brown's office and gave him certified copies of the six enrolled bills, with affidavits from certain functionaries of the General Assembly that, according to the affiants, all procedural requirements for passage had been met, and with copies of the Ohio House of Representatives and Ohio Senate Journals for January 6th through January 10th, 1975, as approved by the respective houses. At that time, the Clerk of the Senate informed the Lieutenant Governor that, when he was prepared to sign the bills, he (the Clerk of the Senate) would bring the original enrolled bills to the Lieutenant Governor. The condition under which the latter would be given the original enrolled bills would be only when he agreed to sign them.

An engrossed bill is one prepared and maintained by the clerk's office, which reflects all amendments to the bill as introduced. Amendments are added to the engrossed bill as they are made.

An enrolled bill is one prepared by the clerk's office of the originating house after passage by both houses. It is printed in the form of an act which reflects the engrossed bill passed by the General Assembly. The enrolled bill is the one presented to the Lieutenant Governor and Governor for their signatures and to the Secretary of State for filing.

At 5:00 p. m. on January 11th, Senator Oliver Ocasek, the Democratic President Pro Tempore of the Senate, another senator, and at least one other individual met with

the Lieutenant Governor in his office. It was at that time proposed that Lieutenant Governor Brown would give his word that, if the original enrolled bills were given to him, he would sign them or return them within a "reasonable" period of time. The term "reasonable" was not defined. The Lieutenant Governor said he would contact Senator Ocasek by 6:00 p. m. that day, which he did not do.

Sometime after 6:00 p. m. on the same day, Senator Ocasek ordered the transmission of the six enrolled bills to Governor Gilligan for his signatures, without the signatures of the Lieutenant Governor. The bills were then brought to Governor Gilligan at the private home of a friend in Bexley, where he had played some tennis earlier, and he signed them.

The six bills were later presented to Secretary of State Ted W. Brown for filing, but he refused to accept them for that purpose because they lacked the signatures of the Lieutenant Governor. The six bills were then delivered to Governor James A. Rhodes, in whose custody they remain pending the outcome of this appeal.

Senator Michael J. Maloney commenced this action in the Court of Common Pleas of Franklin County on January 13, 1975, pursuant to R. C. 2721.01 *et seq.,* as a resident, citizen and taxpayer and in representation of all residents, citizens and taxpayers as a class, seeking a declaratory judgment that the six bills contravened the Ohio Constitution and laws and were void, together with a request for certain injunctive relief. In June of 1975, judgment was entered declaring the six enrolled bills to be incomplete legislation and ineligible for filing with the Secretary of State, granting injunctive relief, and setting forth separate findings of fact and conclusions of law.

Upon appeal, the Court of Appeals affirmed that judgment.

### III.

The Attorney General of Ohio, representing Senator Ocasek and the other appellants, urges this court that: (1) the presence or absence of the Lieutenant Governor's signature upon a bill does not affect its validity; (2) the Lieu-

tenant Governor's only duty, under Section 15(E), Article II, is to certify that the bill in question has been read three times on three different days and received a constitutional majority in the Senate and he has no other duties with respect to enacted legislation; (3) when the Lieutenant Governor acts in his capacity as presiding officer of the Senate, he is subject to the constitutional and parliamentary rules which govern the Senate and to the ultimate authority of the Senate, and, if the Lieutenant Governor does not sign a bill which has been properly passed, the Senate may transmit such a bill directly to the Governor in order to assure the efficacy of its actions; (4) the Ohio Constitutional Revision Commission, whose recommended language was adopted verbatim by the people of Ohio, clearly evidenced its intent that the lack of a presiding officer's signature on a bill should not invalidate it.

My consideration of this position, in the face of the explicit provision of Section 15(E), Article II of the Ohio Constitution, requires a review of some elemental constitutional doctrine.

Commencing with a definition of the term, a constitution is the form of government, delineated in writing by the people, in which certain first principles of fundamental laws are established. It is the absolute rule of action and decision for all officers of government in respect to all points covered by it. It is certain and fixed, and reflects the will of the people. It is the supreme law of Ohio. It is paramount to the power of the legislature, and can be revoked or altered only by the authority that made it, the people. The life-giving principle and the death-doing stroke, insofar as a provision of the Constitution is concerned, must proceed from the same hand, that of the people.

Section 15(E), Article II, was adopted, effective May 8, 1973, by the electors of the state of Ohio by the Vote: "Yes," 679,076; "No," 575,881. Until it is changed by the vote of the people it binds all to its terms.

The question follows then, what are legislatures? Clearly, they are creatures of the Constitution which owe their existence to the Constitution and derive their pow-

ers therefrom. The Constitution is their commission and all their acts must be conformable to it or else these acts will be void. The Constitution is the work or will of the people themselves, in their original, sovereign and unlimited capacity. Laws are the work or will of the legislature in their derivative and subordinate capacity. The one is the work of the creator, and the other of the creature. The Constitution fixes limits to the exercise of legislative authority, and prescribes the orbit within which it must move. It is the sun of the political system around which all legislative, executive and judicial bodies must revolve. And any act of the legislature repugnant to that Constitution is absolutely void. Importantly too, the Constitution of a state is stable and lasting until changed by vote of the people; it is not to be worked upon by the political temper of the times, nor to rise and fall with the tides of political events, nor to be artfully manipulated or misinterpreted for momentary, political expediency. In the sometimes violent atmosphere generated by opposing political parties, the Constitution should remain firm and immutable.

In any event, because of my refinement of the particular issue posed to us, it is unnecessary to pass on the Attorney General's point numbered (1) herein. Further, I am constrained to reject his points numbered (2), (3) and (4) herein, as reading language into Section 15(E), Article II, which is not contained therein for the purpose of contracting the Lieutenant Governor's assigned duty into extinction. It is obvious, upon a consideration of these latter points, that powerful and ingenious minds have taken as a postulate that the duty entrusted, under Section 15 (E), Article II, to the Lieutenant Governor, a constitutional officer, may be contracted by construction, to the narrowest possible compass or even ignored.

## IV.

By its terms, Section 15(E), Article II of the Ohio Constitution provides that every bill which has passed both houses of the General Assembly shall be signed by the presiding officer of each house to certify that the procedural requirements for passage have been met. The pre-

siding officer of the Senate is the Lieutenant Governor. There can be no doubt that it was competent for the people to invest the Lieutenant Governor with all the powers and duties they might deem proper and necessary.

In considering this question, we must never forget that it is a Constitution we are expounding. The constitutional provision in question was submitted (along with others) to the people of Ohio. They were at perfect liberty to accept or reject it and their act was final. When adopted, it was of complete obligation and bound the both houses of the General Assembly to submit bills to the Lieutenant Governor for his signature. This requirement is a part of the Constitution of Ohio and, if there be any who deny its necessity, none can deny its authority.

The words of the constitutional provision are express and incapable of being misunderstood. They admit of no variety of construction. To assume the attitude, taken by President Pro Tempore Ocasek and the Democratic majority under his leadership, not to present these enrolled bills to Lieutenant Governor Brown, requires no ordinary share of intrepidity for the opposition minority to thereafter assert that bills adopted under these circumstances were bold and plain usurpations, to which the Ohio Constitution gave no countenance.

In the absence of any statement by the Lieutenant Governor that he would not sign the bills, the majority party, in an effort to induce the Lieutenant Governor to agree to sign the bills before they would release the original enrolled bills to him, informed the Lieutenant Governor (by delivering to him what purported to be certified copies of all six enrolled bills, notarized letters from officers and committee chairmen of the Senate and House, and printed copies of the House and Senate Journals) that in their opinion the procedural requirements for passage of the bills had been met.

The Lieutenant Governor's reaction to the foregoing procedure was as follows:

"* * * it is not the determination of the Chairman of the Committee, the Speaker of the House, the Clerk of the

House, the Clerk of the Senate, the President Pro Tem [sic] of the Senate, the Chairman of the Rules Committee to make the decision of the presiding officer of the Ohio Senate, whoever he may be, past or future."

After the presentation to the Lieutenant Governor of the aforestated documents, the Clerk of the Senate—a Democrat—refused to permit the Lieutenant Governor the opportunity to read, examine and compare the original engrossed and enrolled bills and the original House and Senate Journals (all of which the Lieutenant Governor had repeatedly requested during the week of January 6, 1975) unless the Lieutenant Governor agreed to the following condition: The Lieutenant Governor must, before he would be given the original enrolled bills and journals, agree to certify that the procedural requirements for passage of the bills had been met.

The Lieutenant Governor rejected the foregoing condition and, as a result, was denied the right and privilege to read, examine and compare the original enrolled bills and engrossed bills and the journals.

The implicit condition precedent to the actual signing of a bill is the act of presentment, that is, the presentment to and receipt by the Lieutenant Governor of the original enrolled bills. In this regard, paragraph three of the findings of fact by the Court of Common Pleas reads:

"Following passage of the six bills in question by the Ohio General Assembly the Lieutenant Governor of Ohio was refused the original engrossed and enrolled bills and the original Senate Journals, despite his frequent request of the Senate clerk * * *."

The failure, therefore, to satisfy the implicit presentment requirement prevented the Lieutenant Governor from carrying out his duty under Section 15(E), Article II of the Ohio Constitution, i. e., the duty to sign "[e]very bill which has passed both houses of the General Assembly * * *."

Because the six enrolled bills in question were not presented to the Lieutenant Governor for his signature or for his refusal to sign, as required by the Ohio Constitution, I

would hold the said six bills to be constitutionally invalid. Further, if the Lieutenant Governor, upon being presented with the enrolled bills, had refused to sign them, or delayed signing them, failing to certify that the procedural requirements for passage have been met, then, and in that case, there was an orderly, lawful and obvious manner in which the Democratic leadership in the General Assembly could have proceeded in order to accomplish the passage of its desired bills.

For the reasons stated above, I would affirm only that part of the judgment of the Court of Appeals rendered on September 23, 1975, which affirmed the portion of the judgment of the trial court holding that the Lieutenant Governor must be provided with the opportunity to perform his mandated duty under Section 15(E), Article II of the Ohio Constitution; and further, I would hold that, when the Lieutenant Governor is not afforded this opportunity and the bills not bearing his signatures are later signed by the Governor, then, and in that case, such bills are constitutionally invalid and fail of enactment into law.

P. Brown, J., concurs in the foregoing concurring opinion.

Paul W. Brown, J., concurring in part.

The majority concludes that the bills in question, presented to the Secretary of State after being signed by Governor Gilligan, were "laws," and that in rejecting their proffered filing, the Secretary of State was determining "judicial questions dealing with the constitutionality" of such laws.

Although I agree that the Secretary of State may not refuse to file a law where the basis of his refusal rests upon doubts concerning its constitutionality, I disagree that he must accept for filing, without further proof in a court of competent jurisdiction if he chooses to require it, a purported law upon which there does not appear the signature of the Lieutenant Governor as required by the Constitution. We note that the action before us is not one of mandamus

against the Secretary of State. Because it is not, the majority's conclusion that the six laws are invalid renders paragraphs one and two of the syllabus advisory.

Nor do I perceive any duties omitted or options unexercised by Governor Gilligan's successor under the facts of this case. The purported legislation, having been signed by Governor Gilligan and forwarded to the Secretary of State, was not subject to veto by the successor Governor, nor had he any statutory duty or other obligation to pass upon its validity, or to transmit it to any person. The majority discusses as "unmistakably clear" the options of one acting as Governor with respect to bills "sent to him for signature." Clearly, these options do not apply to a successor Governor with respect to bills signed and transmitted by his predecessor to the Secretary of State. Nor does return of the questionable legislation to the office of the Governor, after its rejection by the Secretary of State, place any duty upon the successor Governor, other than to safeguard it and to release it upon demand by an appropriate authority.

Since this cause concerns neither a mandamus action against Governor Rhodes, nor any refusal by him to act by reason of an injunction, I concur only in so much of the majority opinion as declares each of these laws constitutionally invalid.

CORRIGAN, J., concurs in the foregoing concurring opinion.

CELEBREZZE, J., dissenting. The first two paragraphs of the syllabus in the majority opinion are correct propositions of law and were the syllabus to close at this point I would be obliged to concur therein, at which time, I believe, the six laws enacted herein would be valid acts of the General Assembly and no court "could permanently enjoin the Secretary of State" from doing that which he had already done. It could be fairly argued, as stated in the majority opinion, that where the Secretary of State, in the performance of a ministerial act pursuant to his oath

of office, accepts a law, signed by the Governor, for filing, as he did in this case, it is a *fait accompli* and in my view the "return" of such legislation to the Governor is an *ultra vires* act of no significance.

It is the conclusion reached by the majority in the third paragraph of the syllabus that prompts my dissent.

The majority opinion accurately depicts the events of the first week of the 111th General Assembly which began January 6, 1975. This was also the final week of the administration of Governor John J. Gilligan. Under the Ohio Constitution, the members of the General Assembly, as elected the preceding November, convene on the first Monday of the year (January 6, 1975), while the incoming Governor, also elected the preceding November, does not take office until the second Monday of the year (January 13, 1975). The purpose of this staggered commencement was to provide for the approval of a budget which formerly ran from January 1 to December 31. Thus, there existed a seven-day hiatus in which the outgoing Governor and the newly-elected General Assembly served concurrently. This seven-day period was the only portion of time during the Gilligan administration when he had a Democratic majority in both houses of the General Assembly. It hardly needs to be stated that this seven-day period provided an opportune time in which the Gilligan administration could implement its legislative goals.

During this week the Gilligan administration attempted to enact the six bills at issue herein into law. It is undisputed that Lt. Governor Brown never signed these bills. All parties have extensively briefed and orally argued the issue of whether such a signing by the Lt. Governor, pursuant to Section 15(E), Article II of the Ohio Constitution as amended May 8, 1973, affects the constitutional validity of enacted legislation.

The thrust of the majority opinion revitalizes the ancient ritual of formal presentment, signing and authentication to the demise of established legislative procedure in Ohio. The evidence adduced in the trial court below clearly reveals that enrolled bills are never left with the Lt. Governor, and that the Lt. Governor's signature, prior to Jan-

uary 11, 1975, had always been obtained in a matter of moments.

The following excerpts from the record in this cause are illustrative of the procedure utilized in the legislature with respect to the obtainment of the Lt. Governor's signature:

Mr. William H. Chavanne, the present Clerk of the Senate, testified:

"Q. Mr. Chavanne, what is your procedure for presenting Bills to the Lieutenant Governor?

"A. Well, the normal procedure that we go through is as soon as the enrolled Bill is prepared, we will call the Lieutenant Governor's office and ask him if he is ready to sign the legislation. If he says, yes, we'll come down and take the Bill to him, and he'll sign it, and we'll go back up to our office."

Lt. Governor John W. Brown testified as follows:

"Q. Isn't it also a fact, Lieutenant Governor, that when you were in your office and you signed Bills in your office, that the clerk's office would call down to your office and say, 'Are you ready to sign Bills in your office?'

"And you would say, 'Yes,' or your secretary would say, 'Yes,' and the message clerk would then come down and present you with Bills to sign, and then you would then sign them? Isn't that a fact, sir?

"A. No.

"Q. What is the fact?

"A. You have made an error in saying my secretary said so. Nobody directs the office of the Lieutenant Governor to tell when he's ready to sign bills or not sign Bills, so I want to make that very clear for you that I make the decisions, and when the clerk called and said, 'I have Bills to sign, are you ready to sign,' the interpretation is, are you in your office for the purpose of receiving these Bills, and if you are ready to do so, we'll bring them down, then them bringing them down does not necessarily mean that I necessarily sit there and blindly affix my name to every line.

"Q. Lieutenant Governor, let me correct something, when I said the secretary said that you are ready, I would

assume that she had talked to you and you said, yes, I'm ready.

"A. I take the calls.

"Q. I want to make that clear. I wasn't saying that the secretary made that decision.

"The point I am making, the clerk's office would call your office first and ask if you were ready to sign the Bills, and then they would bring the original Bills down for your signature, isn't that correct?

"A. Yes."

Harold Harvey Blair, Message Clerk of the Senate from January to the middle of August 1974, testified by way of deposition, that:

"Q. By Mr. Kinder: From the point at which you received the bills with the Speaker or the Speaker Pro Tempore's signature on it, was your procedure from that point on essentially the same?

"A. For both House and Senate votes?

"Q. Yes, sir.

"A. Yes.

"Q. What was the procedure?

"A. Well, if we were going into session shortly that day, then I would hold the bills in my desk and wait until the Lieutenant Governor was at the podium to get his signature on the bills. And in such instances, I would normally approach him before the beginning of the session indicating that I did have bills for his signature.

"Q. Excuse me, would you at that instant specify what bills you had?

"A. No, I would only indicate that I had some bills for signature.

"Q. Go ahead.

"A. Normally within—after the Lieutenant Governor began the session, within a couple of minutes, I would hand the bills that I had up to him and he would sign each bill individually and then pass it, as he signed the bills, back to me. If we weren't going into session right away—

"Q. How long would the Lieutenant Governor look at each bill as he was sitting at the desk?

"A. From my point of view, it was that he would thumb through the bills looking for the signature page and

go directly to that page. It was just a matter of from my point of view checking to see where the signature was required and affixing it.

"\* \* \*

"Q. By Mr. Kinder: Would you describe John Brown's the Lieutenant Governor's procedure in his office with some particularity?

"A. Well, as I said, when I was at his desk, I would hand him the stack of bills and having the stack before him, he would take the first bill, look for the signature page, put his signature on, then hand the bill—it varied. Sometimes he would just turn the bill over if he had several bills. But normally with only three or four bills, he would hand each bill back to me immediately after the signature at which time I would check to make sure that he had signed in the right place. But there was never an instance where he would set certain bills aside. They were always signed in the order in which I had given them."

The above excerpts clearly reveal that the procedure utilized in the instant cause by the Clerk of the Senate (as documented in the statement of the case) comported with the established legislative practice in the Senate, and that any deviation from that procedure was caused not by the Clerk of the Senate or by the leaders of the majority party, but by Lt. Governor Brown himself.

The evidence of record indicates that the obtainment of the Lt. Governor's signature normally required a matter of minutes. In the instant matter, due to limitations of time, the leaders of the majority party feared that Lt. Governor Brown would simply keep the six bills in his possession until the incoming Governor took office the following Monday, January 13, 1975, with the inevitable result described in the majority opinion, should the original enrolled bills be entrusted to him. Accordingly, these individuals attempted to reach a compromise solution. Lt. Governor Brown testified as to the nature of such a compromise as follows:

"Q.—approximately between 4:30 and 5:00, and Senator Ocasek and Senator Headley came down to your office to discuss the matter, and you recall that?

"A. Yes.

"Q. What's your recollection of the conversation that took place at that point?

"A. At that particular point I tried to find out what that statement of, 'One or two more recesses will be enough,' and I don't know today what, 'One or two more recesses will be enough,' really means.

"I think that you ought to know as well as everyone else that at no time have I ever refused to carry out my obligations set by the Constitution. At no time did I ever tell anybody I wouldn't sign. I was in hopes that we could reach a point of agreement whereby I could be presented those things that I had wanted, those things that I have requested, namely the originals, the Journal and the engrossed Bills and enrolled Bills, not copies, not printed copies, not anything that was certified to be a copy of it but the originals. I didn't think that this request was at all unreasonable in view of what had transpired.

"Now, at that particular point in time our discussion went to the point, *well, if I were to refuse to sign them, would I return them within a reasonable time, and I said, 'I can't answer that now. I have got to discuss it with my staff and I will inform you somewhere around 6:00 o'clock,'* as I recall the time.

"* * *

"Q. *But because of that agreement you had the obligation to call Senator Ocasek around 6:00 to tell him whether or not you could run with that agreement, isn't that correct?*

"A. Right.

"* * *

"Q. *Did you call Senator Ocasek at around 6:00?*

"A. *No, I did not.*" (Emphasis added.)

From these excerpts, the testimony discloses two important conclusions of fact. First, that the normal procedure for obtaining the signature of the Lt. Governor on an enrolled bill was a perfunctory presentation at his request and resulted in his instantaneous signing. Second, and without intending to judge their chosen course of conduct, the stated fears of Senator Ocasek and Senator

Headley were solidly founded, especially in view of the last two answers.

To this writer, the issue in this case can be succinctly stated as follows: Did the absence of the Lt. Governor's signature from the six bills in question invalidate that otherwise lawful legislation?

Section 15, Article II of the Ohio Constitution, sets forth how bills shall be passed. Section 15(A), Article II states in part: "* * * and no bill shall be *passed* without the concurrence of a majority of the members elected to each house." Section 15(E), Article II states: "Every bill which *has passed* both houses of the general assembly shall be signed by the presiding officer of each house *to certify that the procedural requirements for passage have been met* and shall be presented forthwith to the Governor for his approval." (All Emphasis added.) Section 16, Article II provides for the Governor's approval or veto, and mandates when a bill becomes a law.

It is easily discernible from the above that the signatory provision of Section 15(E) has no application until such time *after* a bill *has passed* both houses. Thus, it is unessential to that portion of the legislative process. The appellees herein rely heavily on the case of *State* v. *Kiesewetter* (1887), 45 Ohio St. 254. It is noteworthy, if not crucial, to observe that this case appeared some 86 years prior to the existence of the current version of this section of the Ohio Constitution, and some 16 years before the executive branch of government had a part in the proceeding by which a bill becomes a law (*i. e.* to provide for the Governor's approval or veto). Moreover, the emphasized language of Section 15(E) above beginning with the words "to certify" was not present at all in Section 17, Article II (predecessor to Section 15 [E]) which was the subject of the decision in the *Kiesewetter* case.

One might fairly conclude that the phrase "to certify" was inserted merely to illustrate the largely ministerial and nonsubstantive, hence directory, nature of the Section 15(E) signatory provision. The language "procedural requirements for passage" referred to in Section 15(E) are (1) that the bill has been considered the requisite number

of times [Section 15(E)] and (2) been passed by the constitutionally required majority [Section 15(A)]. It is the Governor who must decide what bills shall become law and in the interest of protecting that decision he may (as indeed he must from the record) refer to the appropriate journals to determine whether such procedural requirements have been met. Such a course lends further support to this writer's conclusion that the signatory provision of Section 15(E) is directory only. The appellants' position is buttressed by the following language taken from the discussion of Section 15(E), Article II (enacted May 8, 1973), in Ohio Constitutional Revision Commission, Recommendations for Amendments to the Ohio Constitution, Part 1 (1971):

"The origin of the requirement that bills be signed is the provision in Section 17 of Article I of the Constitution of 1802 that 'every bill having passed both houses, shall be signed by the speakers of their respective houses.' The provision in its present form was embodied in Section 17 of Article II of the Constitution of 1851, reading as follows:

"The presiding officer of each House shall sign, publicly in the presence of the House over which he presides, while the same is in session, and capable of transacting business all bills and joint resolutions passed by the General Assembly.

"At one time the signing by presiding officers was regarded as essential to the bill's authenticity. *State* v. *Kieswetter,* 45 Ohio St. 254 (1887) is still cited as authority for the proposition that Section 17 is mandatory, not merely directory, as Ohio courts have found other constitutional procedural limitations to be. * * *

"* * *

"In *Ritzman* v. *Campbell*, 93 Ohio St. 245 (1915) the Ohio Supreme Court adopted the view that the enrolled bill is conclusive as to the contents of an act where a one word variance was claimed. The Court reiterated the rule that courts will consult the legislative journals as appropriate evidence whenever an issue of fact is raised as to whether any bill received less than the constitutional

majority required. The latter requirement, said the Court, is a 'mandatory' one. Refusing to look beyond the enrolled bill for the purpose of establishing the fact that a discrepancy in content existed between the enrolled bill and the bill as it might appear on inspection of the journals, the Court reasoned, in part, that an enrolled bill is accorded conclusive effect because of the attestation of the presiding officers of the General Assembly. Among constitutional provisions referred to in the opinion as mandatory were the requirements of Section 17 for the signing of bills by presiding officers.

"Now, however, the Governor participates in the legislative process, and the *Ritzman* dicta does not take this into account. The preferable rule, in the Commission's view, is not one that invalidates legislation for failure of a presiding officer to sign, but one that uses the signatures of the presiding officers as a mere certificate to the Governor that the act has been considered the requisite number of times and been adopted by the constitutional majority. An incorporation of the requirements of Section 17 for the signing by presiding officers with provision for approval by the Governor (as is found in proposed Section 15) would vary the rule and rationale of the two cited cases.

"* * *

"The committee regarded the act of signing bills as essentially administrative in nature and not one that need be witnessed. At one time many provisions existed in the law requiring a ritual of execution—the sealing of contracts and other documents, for an example. They came into being at a time when few could read and have little validity today. Many have been eliminated as unnecessary."

It is abundantly clear that it was the intention of the Commission in proposing the Constitutional Amendment to bring the procedure into line with the prevailing practice thus in effect overruling the *Kiesewetter* decision rendered at a time when the flow of legislation was much slower than today. During the last session of the legislature some 396 bills were enacted into law. To suggest that the Lt. Governor is required to personally examine and certify that the requirements of Section 15, Article II, have been com-

plied with in order to constitutionally validate an enrolled bill by affixing his signature thereto is a monumental task impossible of human performance.

Consider the ramifications of authenticating the procedural aspects involved in the passing of a bill. Section 15, Article II, with respect to the manner in which a bill shall be passed, reads:

"(A) The General Assembly shall enact no law except by bill, and no bill shall be passed without the concurrence of a majority of the members elected to each house. Bills may originate in either house, but may be altered, amended, or rejected in the other.

"(B) The style of the laws of this state shall be, 'be it enacted by the General Assembly of the state of Ohio.'

"(C) Every bill shall be considered by each house on three different days, unless two-thirds of the members elected to the house in which it is pending suspend this requirement, and every individual consideration of a bill or action suspending the requirement shall be recorded in the journal of the respective house. No bill may be passed until the bill has been reproduced and distributed to members of the house in which it is pending and every amendment been made available upon a member's request.

"(D) No bill shall contain more than one subject, which shall be clearly expressed in its title. No law shall be revived or amended unless the new act contains the entire act revived, or the section or sections amended, and the section or sections amended shall be repealed.

"(E) Every bill which has passed both houses of the General Assembly shall be signed by the presiding officer of each house to certify that the procedural requirements for passage have been met and shall be presented forthwith to the Governor for his approval."

Then, measure this against the accepted practice employed by the Lt. Governor as disclosed by the record.

I conclude, therefore, that the signatory provisions in Section 15 (E), Article II, are purely directory, and provide only for the performance of a ministerial function "to certify that the procedural requirements for passage have been met."