THE STATE EX REL. OHIO GENERAL ASSEMBLY
ET AL. *v.* BRUNNER, SECY. OF STATE.

[Cite as *State ex rel. Ohio Gen. Assembly v. Brunner,*
114 Ohio St.3d 386, 2007-Ohio-3780.]

(No. 2007–0209—Submitted May 1, 2007—Decided August 1, 2007.)

CUPP, J.

{¶ 1} This is an original action filed by relators, the Ohio General Assembly, Ohio Senate President Bill Harris, and Ohio House of Representatives Speaker Jon Husted, to compel respondent, Ohio Secretary of State Jennifer Brunner, to treat 2006 Am.Sub.S.B. No. 117 as a duly enacted law and to fulfill all of her duties as set forth in R.C. Chapter 149 regarding the law.

{¶ 2} Former Governor Bob Taft had filed the unsigned bill with former Secretary of State J. Kenneth Blackwell on the last business day of their terms of office, but Secretary of State Brunner reconveyed the bill to Governor Ted Strickland upon his request on the first day of their terms of office. The governor then returned the bill on the same day to the secretary of state with his veto.

{¶ 3} This case raises an issue of first impression and has been ably presented by the parties and the various amici curiae. In this case, we decide only whether Am.Sub.S.B. No. 117 had become a law before January 8, 2007, when Governor Strickland and Secretary Brunner took office, and thus whether the governor's attempted veto of Am.Sub.S.B. No. 117 on that date was effective.

I

{¶ 4} The Ohio Senate passed Am.Sub.S.B. No. 117 on October 26, 2005, during the 126th General Assembly, and the clerk of the Ohio Senate signed that engrossed bill.[1] On December 14, 2006, the Ohio House of Representatives passed Am.Sub.S.B. No. 117, and the clerk of the Ohio House of Representatives signed that engrossed bill. On that same date, the Ohio Senate concurred in Am.Sub.S.B. No. 117, and the clerk of the Ohio Senate signed that engrossed bill. The bill was enrolled[2] and signed by the Senate president and the Speaker of the House.

---

1. "An engrossed bill is one prepared and maintained by the clerk's office, which reflects all amendments to the bill as introduced." *Maloney v. Rhodes* (1976), 45 Ohio St.2d 319, 334, 74 O.O.2d 499, 345 N.E.2d 407 (Corrigan, J., concurring). See, also, Legislative Service Commission, Legislative Glossary, available online at http://www.lsc.state.oh.us/guidebook/glossary.pdf (an "engrossment" is "[t]he preparation of a copy of a bill by incorporating all of its amendments. The House or Senate Clerk's office engrosses a bill before it is sent to the Rules Committee and before it is sent to the other house").

2. "An enrolled bill is one prepared by the clerk's office of the originating house after passage by both houses. It is printed in the form of an act which reflects the engrossed bill passed by the General Assembly. The enrolled bill is the one presented to the * * * Governor for [his] signature[ ] and the Secretary of State for filing." *Maloney*, 45 Ohio St.2d at 334, 74 O.O.2d 499, 345 N.E.2d 407 (Corrigan, J. concurring). See, also, Legislative Service Commission, Legislative Glossary, available online at http://www.lsc.state.oh.us/guidebook/glossary.pdf (an "enrolled bill" is "[a] printed version of a bill that is prepared when the bill has passed both houses. The enrolled

{¶ 5} On December 21, 2006, the Ohio House of Representatives adjourned for the legislative session, or adjourned "sine die."[3] On Tuesday, December 26, 2006, the Ohio Senate—and thus the General Assembly—adjourned sine die.

{¶ 6} On Wednesday, December 27, 2006, 13 days after the General Assembly passed Am.Sub.S.B. No. 117, the governor was presented with Am.Sub.S.B. No. 117. The clerk of the Ohio Senate conferred with members of the governor's staff to coordinate an appropriate date for the presentation of the bill, along with other bills, and it was determined that December 27 would be the date of presentment.

{¶ 7} On the last business day of Governor Taft's term of office, which was Friday, January 5, 2007, the governor filed Am.Sub.S.B. No. 117 with the office of the Ohio secretary of state. As noted in the Governor's Office Bill Record, the secretary of state received and signed the bill.

{¶ 8} The Governor's Office Bill Record is a paper journal that is the property of the governor, but is located in the secretary of state's office as a matter of convenience because of its size and weight. According to R.C. 107.10(A), the record is a "register of every bill passed by the general assembly that has been presented to the governor, in which is entered the number of the bill, the date the bill was presented to the governor, and the action taken on it by the governor and the date of the action." Most of the information contained in the register is filled in by the governor's staff, and that information is not altered by the secretary of state's staff. For administrative purposes, the secretary of state also maintains electronic records concerning legislation filed in the office, and the secretary makes these records readily available to the public.

{¶ 9} The governor neither vetoed nor signed the bill. Instead, the governor issued a January 5 press release specifying that he had "decided to allow Amended Substitute Senate Bill 117 [to] become law without [his] signature."

{¶ 10} On Monday, January 8, 2007, the first day of the terms of office of Governor Ted Strickland and Secretary of State Jennifer Brunner, the governor requested that the secretary "return" Am.Sub.S.B. No. 117 to him. The governor specified that he was requesting the immediate return of the bill to him for further review because "the 10–day presentment period for that bill [had] not yet concluded." On that same date, the secretary of state complied with the governor's request. Still later on January 8, 2007, the governor reconveyed

---

bill is signed by the Speaker of the House and the President of the Senate and becomes an act awaiting the Governor's approval").

3. See Legislative Service Commission, Legislative Glossary, available online at http://www.lsc.state. oh.us/guidebook/glossary.pdf ("Adjournment sine die ('without a day') refers to the final adjournment of a General Assembly").

Am.Sub.S.B. No. 117 to the secretary of state along with his message that he was vetoing the bill.

{¶ 11} The Governor's Office Bill Record notes that Am.Sub.S.B. No. 117 was presented to the governor on December 27, that the governor acted upon it on January 4, and that the bill was delivered to, and filed with, the secretary of state on January 5, 2007. The bill record also shows that the bill was returned to the governor on January 8 and that the governor delivered it back to the secretary on that same date along with his veto of the bill. The secretary's electronic record, however, merely notes that Am.Sub.S.B. No. 117 was filed on January 8, 2007, and that it was vetoed.

## II

{¶ 12} On February 2, 2007, about three and one-half weeks after the veto, relators, the Ohio General Assembly, Ohio Senate President Bill Harris, and Ohio House of Representatives Speaker Jon Husted, filed this action for a writ of mandamus to compel respondent, Secretary of State Jennifer Brunner, to (1) "change the entry in both the paper and electronic Journals she keeps to reflect the fact that Amended Substitute Senate Bill No. 117 was not vetoed and was filed with the Secretary of State on January 5, 2007," (2) "set forth in both the paper and electronic Journals she keeps that any referendum petitions challenging Amended Substitute Senate Bill No. 117 must be filed with the Secretary of State within 90 days of the filing of Amended Substitute Senate Bill No. 117 on January 5, 2007," (3) "maintain and preserve Amended Substitute Senate Bill No. 117, as filed by Governor Taft on January 5, 2007, and make accurate records available to the Legislative Service Commission so that it can fulfill its codification duties," and (4) "fulfill each of the duties and obligations imposed by Chapter 149 of the Revised Code with respect to Amended Substitute Senate Bill No. 117." Both Harris and Husted had voted for Am.Sub.S.B. No. 117.

{¶ 13} After the secretary filed a motion to dismiss, we granted an alternative writ, issued an expedited schedule for briefing and the submission of evidence, and set the case for oral argument. *State ex rel. Ohio Gen. Assembly v. Brunner*, 113 Ohio St.3d 1421, 2007-Ohio-1280, 863 N.E.2d 175. In addition, various amici curiae submitted briefs.

{¶ 14} This cause is now before the court for a consideration of the merits.

## III

{¶ 15} The secretary of state asserts that this case should be dismissed because relators lack standing. "A preliminary inquiry in all legal claims is the issue of

standing." *Cuyahoga Cty. Bd. of Commrs. v. State,* 112 Ohio St.3d 59, 2006-Ohio-6499, 858 N.E.2d 330, ¶ 22. "It has been long and well established that it is the duty of every judicial tribunal to decide actual controversies between parties legitimately affected by specific facts and to render judgments which can be carried into effect." *Fortner v. Thomas* (1970), 22 Ohio St.2d 13, 14, 51 O.O.2d 35, 257 N.E.2d 371.

{¶ 16} Here the relators are the Ohio General Assembly, the Senate president, and the Speaker of the House. In their complaint, the Senate president and the Speaker of the House allege standing in their official capacities as presiding officers of the separate bodies of the General Assembly, as state legislators, as members of the Legislative Service Commission, on behalf of the Ohio General Assembly, and as citizens of the state of Ohio.

{¶ 17} We conclude that the Senate president and the Speaker of the House, as legislators who voted with the majority for passage of the bill, have standing to bring this action. It has been recognized that legislators at times have standing to challenge executive decisions. For example, in *Coleman v. Miller* (1939), 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385, the United States Supreme Court held that state legislators who voted against ratifying a constitutional amendment had standing to bring an action in mandamus. Id. at 438, 59 S.Ct. 972, 83 L.Ed. 1385. That action sought to compel the secretary of the Kansas Senate to remove an endorsement on the resolution stating that it had been ratified by the Senate. Id. at 436, 59 S.Ct. 972, 83 L.Ed. 1385. In so holding, the Supreme Court noted that "at least the twenty senators whose votes, if their contention were sustained, would have been sufficient to defeat the resolution ratifying the proposed constitutional amendment, have an interest in the controversy which, treated by the state court as a basis for entertaining and deciding the federal questions, is sufficient to give the Court jurisdiction to review that decision." Id. at 446, 59 S.Ct. 972, 83 L.Ed. 1385.

{¶ 18} The secretary of state cites *Raines v. Byrd* (1997), 521 U.S. 811, 830, 117 S.Ct. 2312, 138 L.Ed.2d 849, in support of her request that this court hold that the Senate president and Speaker of the House lack standing. In *Raines,* the United States Supreme Court held that individual members of Congress lacked standing to challenge the constitutionality of the Line Item Veto Act because they "do not have a sufficient 'personal stake' in this dispute and have not alleged a sufficiently concrete injury to have established Article III standing." Id.

{¶ 19} *Raines,* however, is not controlling. The congressional members in *Raines* challenged the constitutionality of legislation that had been passed by Congress, which they had merely voted against. *Raines,* 521 U.S. at 814, 117 S.Ct. 2312, 138 L.Ed.2d 849.

{¶ 20} Instead, this matter is akin to *Coleman*, which has been interpreted as standing "for the proposition that legislators whose votes would have been sufficient to defeat (or enact) a specific legislative Act have standing to sue if that legislative action goes into effect (or does not go into effect), on the ground that their votes have been completely nullified." *Raines*, 521 U.S. at 823, 117 S.Ct. 2312, 138 L.Ed.2d 849. In this case, the Senate president and the Speaker of the House voted for the bill at issue, there were sufficient votes to pass the bill, and their votes would in effect be nullified by the governor's veto and the secretary of state's refusal to treat the bill as a validly enacted law. Therefore, we hold that the Senate president and the Speaker of the House, as legislators who voted for the bill, have the requisite standing to bring this mandamus action to prevent their votes from being nullified.

{¶ 21} This conclusion is consistent with *State ex rel. Gilmore v. Brown* (1983), 6 Ohio St.3d 39, 6 OBR 59, 451 N.E.2d 235, in which we decided the merits of a mandamus claim by a sole state representative who had cosponsored a bill that had been passed by the General Assembly and vetoed by the governor. In *Gilmore*, the relator sought a writ of mandamus to compel the governor and the secretary of state to certify and record the bill. Gilmore alleged that the governor's attempted veto of the bill was invalid because the governor had not delivered it in compliance with Section 16, Article II of the Constitution. While we did not specifically address the issue of the relator's standing in *Gilmore*, our decision to reach the merits in that case is consistent with the approach to legislator-standing here.

{¶ 22} Because we conclude that the Senate president and Speaker of the House have standing to sue, as legislators who voted with the majority for Am.Sub.S.B. No. 117, to prevent nullification of their individual votes, we need not, and therefore do not, consider their other proffered bases for standing. Additionally, because we conclude that relators Harris and Husted have standing, we do not reach the question whether the General Assembly has standing to sue in this case. Cf. *Rumsfeld v. Forum for Academic & Institutional Rights* (2006), 547 U.S. 47, 126 S.Ct. 1297, 1303, 164 L.Ed.2d 156, 167, fn. 2 (noting that the presence of one party with standing was sufficient to satisfy standing requirements).

## IV

{¶ 23} In order to be entitled to the requested writ of mandamus, relators (i.e., the Senate president and Speaker of the House) must establish three elements. First, relators must show that they have a clear legal right to have the secretary of state treat Am.Sub.S.B. No. 117 as a duly enacted law for purposes of her

statutory duties. Second, relators must show a corresponding clear legal duty on the part of the secretary of state to perform the requested acts. Finally, relators must demonstrate the lack of an adequate remedy in the ordinary course of the law. E.g., *State ex rel. Boccuzzi v. Cuyahoga Cty. Bd. of Commrs.*, 112 Ohio St.3d 438, 2007-Ohio-323, 860 N.E.2d 749, ¶ 13. We first consider the secretary's contention that relators have an adequate remedy at law.

{¶ 24} The secretary of state asserts that relators' mandamus claim should be denied because relators have an adequate remedy in the ordinary course of law by way of a declaratory judgment that Am.Sub.S.B. No. 117 is a valid law. A writ of mandamus will not issue if there is a plain and adequate remedy in the ordinary course of law. *State ex rel. Rashada v. Pianka*, 112 Ohio St.3d 44, 2006-Ohio-6366, 857 N.E.2d 1220, ¶ 4; R.C. 2731.05.

{¶ 25} Nevertheless, "[i]n general, if declaratory judgment would not be a complete remedy unless coupled with extraordinary ancillary relief in the nature of a mandatory injunction, the availability of declaratory judgment does not preclude a writ of mandamus." *State ex rel. Mill Creek Metro. Park Dist. Bd. of Commrs. v. Tablack* (1999), 86 Ohio St.3d 293, 297, 714 N.E.2d 917. In this case, a declaratory judgment would not be complete without a mandatory injunction ordering the secretary to treat Am.Sub.S.B. No. 117 as a duly enacted law. See *State ex rel. Evans v. Blackwell*, 111 Ohio St.3d 1, 2006-Ohio-4334, 854 N.E.2d 1025, ¶ 39 ("Because a mandatory injunction is an extraordinary remedy, it does not constitute an adequate remedy in the ordinary course of law"). Therefore, relators do not have an adequate remedy in the ordinary course of law by way of a declaratory judgment.

{¶ 26} Relators request a writ of mandamus to compel the secretary of state to maintain and preserve Am.Sub.S.B. No. 117 as a duly enacted law and to fulfill each of the statutory duties imposed upon her regarding Am.Sub.S.B. No. 117.[4] These duties include forwarding copies of each law to clerks of courts of common pleas; distributing the laws to county law libraries, county auditors, and the state library board; publishing and distributing session laws; and distributing laws and journals. See, e.g., R.C. 149.08, 149.09, 149.091, and 149.16. Relators also alleged that the secretary of state failed to follow the directive of R.C. 111.08, which specifies that the secretary of state "shall have charge of and safely keep

---

4. In their complaint, relators also requested a writ of mandamus to compel the secretary to "change the entry in both the paper and electronic Journals she keeps to reflect the fact that Amended Substitute Senate Bill No. 117 was not vetoed and was filed with the Secretary of State on January 5, 2007." Relators did not argue in their merit briefs specifically for a writ compelling the secretary to change the paper and electronic journals, as opposed to fulfilling the statutory duties of her office to keep Am.Sub.S.B. No. 117 as a law and treat it as such in performing her other statutory duties. Accordingly, we do not address the relator's original request for a change to the paper and electronic journals kept by the secretary.

the laws and resolutions passed by the general assembly and such other papers and documents as are required to be deposited in his office." See *Wrede v. Richardson* (1907), 77 Ohio St. 182, 212, 82 N.E. 1072 ("The Secretary of State is the official custodian of our statute laws"). The secretary of state also has a duty to provide access to bills that have become law to the director of the Legislative Service Commission so that the director can ensure proper section numbering and codification of statutes. See R.C. 103.31.

{¶ 27} We have recognized that "[m]andamus will lie to compel [the secretary of state] to perform the official act of accepting and filing the law." *Maloney v. Rhodes* (1976), 45 Ohio St.2d 319, 323, 74 O.O.2d 499, 345 N.E.2d 407. Similarly, mandamus is an appropriate action to compel the secretary of state to safely keep laws passed by the General Assembly and other documents required to be deposited in the secretary's office and to ensure fulfillment of her various publication and distribution duties concerning enacted laws. See R.C. 111.08, 149.08, 149.09, 149.091, and 149.16.

{¶ 28} The secretary of state returned Am.Sub.S.B. No. 117 to the governor because she reasoned that the governor still had time on January 8 to veto the bill before it became law. In response, and to support their showing of a clear legal right and duty, relators claim that Am.Sub.S.B. No. 117 had already become law by January 8, 2007. Relators also claim that the secretary of state lacked authority to make a judicial determination that Am.Sub.S.B. No. 117 had not yet become a law and to transmit the bill to the governor after it had been duly filed by the governor's predecessor in the office of the secretary of state.

## V

{¶ 29} At issue is when the power of the governor to veto a bill under Section 16, Article II of the Ohio Constitution ceases. In the matter now before us, the determination of that issue depends upon when the ten-day period for the governor to veto a bill begins when the General Assembly adjourns sine die.

{¶ 30} Our analysis begins and ends with the Ohio Constitution, our state's most fundamental law. We decide this case solely upon our considered understanding of the requirements expressed within the text of this governing document. The merit or wisdom of the policy contained within the legislature's enactment is entirely outside the scope of our consideration.[5]

---

5. The title of Am.Sub.S.B. No. 117 states that its purpose is "[t]o amend sections 1345.09, 2307.60, 2307.71, 2307.73, and 2317.02 of the Revised Code to specify the nature of damages that may be recovered in certain actions based on unfair or deceptive sales practices, to provide that a final judgment, entered after a trial or upon a plea of guilty in certain criminal actions generally

{¶ 31} The Ohio Constitution's prescribed procedure for the creation of statutory law bears upon the fundamental allocation of authority between the legislative and executive branches of state government. This court acts within its proper constitutional role in construing Section 16, Article II, Ohio Constitution, when its meaning is squarely at issue, as it is in this case. Section 1, Article IV, Ohio Constitution (judicial power of the state vested in the courts).

{¶ 32} We hold that under Section 16, Article II of the Ohio Constitution, the ten-day period for the governor to act upon Am.Sub.S.B. No. 117 began to run on the date that the General Assembly adjourned sine die, which was December 26, 2006. The time for the governor, therefore, to act upon the bill expired, at the latest, on Saturday, January 6, 2007, and the attempted veto by the governor on Monday, January 8, 2007, was without effect. Consequently, as asserted by relators, Am.Sub.S.B. No. 117 had already become law by the time the secretary of state returned the bill to the governor on January 8, 2007.

A

{¶ 33} Once a bill has been passed by both houses of the General Assembly, it "shall be signed by the presiding officer of each house to certify that the procedural requirements for passage have been met and shall be presented forthwith to the governor for his approval." Section 15(E), Article II, Ohio Constitution. If the governor approves the act and signs it, it becomes law. Section 16, Article II, Ohio Constitution. If the governor does not approve the act and vetoes it while the General Assembly is still in session, the bill is returned to the General Assembly. The General Assembly then may reconsider the act, if it chooses, and override the governor's veto, in which case the act becomes law notwithstanding the governor's veto. Id. This basic constitutional law is not in dispute in this case.

{¶ 34} What is in dispute is the computation of the ten-day time limit for the governor to act when the General Assembly has adjourned sine die. If the governor fails to act within the allotted ten days, the governor's authority to veto a bill ceases. Section 16, Article II of the Ohio Constitution provides:

{¶ 35} "If a bill is not returned by the governor within ten days, Sundays excepted, after being presented to him, it becomes law in like manner as if he had

---

precludes the offender from denying any fact essential to sustain that judgment when entered in evidence in a civil proceeding that is based on the criminal act, to make an exception to the attorney-client privilege for communications related to an attorney's aiding or furthering an ongoing or future commission of bad faith by a client that is an insurance company, to prohibit the use of enterprise theories of liability against manufacturers in product liability claims, and to include public nuisance claims under the definition of product liability claims."

signed it, *unless the general assembly by adjournment prevents its return; in which case, it becomes law unless, within ten days after such adjournment,* it is filed by him, with his objections in writing, in the office of the secretary of state. The governor shall file with the secretary of state every bill not returned by him to the house of origin that becomes law without his signature." (Emphasis added.)

{¶ 36} That provision of Section 16, Article II, has two clauses: the first pertains to bills presented to the governor when the General Assembly remains in session, and the second applies when the General Assembly has adjourned sine die. We have held that the reference in Section 16, Article II, to "adjournment" that "prevents * * * return" of a bill means adjournment of the General Assembly sine die. *State ex rel. Gilmore v. Brown* (1983), 6 Ohio St.3d 39, 6 OBR 59, 451 N.E.2d 235.

{¶ 37} The first part of the third paragraph of Section 16, Article II of the Ohio Constitution expressly provides that "[i]f a bill is not returned by the governor within ten days, Sundays excepted, after being presented to him, it becomes law in like manner as if he had signed it." Accordingly, when the General Assembly is in session, the ten-day period during which a governor may sign a bill or return it to the General Assembly (i.e., with his veto message), and after which it becomes law without his signature, begins "after [the bill is] presented to him."

{¶ 38} The second part of the provision states that if "the general assembly by adjournment prevents [the bill's] return * * *, it becomes law unless, *within ten days after such adjournment,* it is filed by [the governor], with his objections in writing, in the office of the secretary of state." (Emphasis added.)

{¶ 39} This second part prescribes a different rule to cover the situation in which the bill cannot be returned to the General Assembly because of its adjournment sine die. In that situation, unlike when the General Assembly is in session, the Constitution does not specify that the ten-day period begins to run from its presentment to the governor but instead specifies counting the ten days "after such adjournment." We hold therefore that under Section 16, Article II of the Ohio Constitution, when the General Assembly adjourns sine die, preventing the return of a bill to the General Assembly, the bill "becomes law unless, within ten days after such adjournment," it is filed by the governor with the governor's objections in writing, in the office of the secretary of state.

{¶ 40} In the present matter, the ten-day period began to run on December 26, 2006, the day the General Assembly adjourned sine die, and ended, at the latest, on January 6, 2007. Whether or not Sundays are excluded from the ten-day count in the second part does not need to be determined here because under either situation, the ten days elapsed before Monday, January 8, 2007. Accordingly, when the governor attempted to veto the bill on January 8, 2007, the bill

had already become law, and the governor lacked authority under Section 16, Article II, to veto it.

{¶ 41} Additionally, because Am.Sub.S.B. No. 117 had become law before January 8, 2007, the secretary had then and continues to have a duty to maintain and preserve it. R.C. 111.08. The secretary also has a duty to perform her other statutory responsibilities applicable to duly enacted laws. Those duties include "compil[ing], publish[ing], and distribut[ing]" the session laws, R.C. 149.091, forwarding copies of new laws to the courts of common pleas, R.C. 149.08, and county auditors and libraries, R.C. 149.09, and making available bills that have become law to the director of the Legislative Service Commission to ensure proper sectional numbering of statutes pursuant to R.C. 103.131.

{¶ 42} The secretary of state, however, contends that "ten days after such adjournment" applies only when the General Assembly presents a bill to the governor and then adjourns. But the secretary of state's position, that when presentment follows adjournment "the ten-day after-presentment rule * * * governs," lacks support in the text of the Constitution. For this reason, we must respectfully disagree with the similar view expressed by the dissents.

{¶ 43} One dissenting opinion premises its interpretation of the constitutional text on the idea that "[a]n adjournment cannot 'prevent [a bill's] return' unless the bill is already * * * in the hands of the governor." This is because, in the author's view, the constitution "presumes that the governor has the bill in his possession." ¶ 182 (Lanzinger, J., dissenting). But in our perhaps more literal reading, we believe that the language simply focuses on the type of adjournment that triggers application of the second part of the constitutional provision. That is, the phrase "prevents its return" distinguishes between a temporary recess of the General Assembly, during which the usual ten-days-from-presentment rule applies, see *Gilmore,* supra, from General Assembly's adjournment sine die, a final adjournment of the legislative session that "prevents" the bill's return to the General Assembly, and triggers the ten-days-from-adjournment rule.

{¶ 44} It may well be that the dissenters' reading of the provision has the practical advantage of allowing the governor at least ten days in all cases to review bills enacted by the General Assembly. But with all due respect, we believe that our reading more closely comports with the constitutional text, which is the controlling factor.[6]

---

6. The federal cases relied upon by one of the dissenting opinions also do not prescribe the meaning of the differently worded Ohio constitutional provision. A president's failure to return a bill to Congress with a veto message after Congress's adjournment results in the bill *not* becoming law. However, Ohio has no pocket veto, and a governor's failure to return a bill within the prescribed time results, instead, in the bill becoming law—which is a significant difference. Cf. Clause 2, Section 7, Article I, United States Constitution.

{¶ 45} The secretary of state also argues that *Maloney v. Rhodes* supports her proffered "ten-day-after-presentment" rule. In *Maloney,* the governor had signed a bill, but the secretary of state refused to file it because of the secretary's determination that the bill had not been certified by the president pro tempore of the Senate, as required by Section 15(E), Article II, Ohio Constitution. *Maloney,* 45 Ohio St.2d at 320, 74 O.O.2d 499, 345 N.E.2d 407. In *Maloney,* we noted in our general discussion of Section 16, Article II, that "[i]f the General Assembly *adjourns within the ten day period,* * * * [the bill] becomes law unless the Governor, within ten days of the adjournment, files it with his objections in writing in the office of the Secretary of State." (Emphasis added.) Id. at 324, 74 O.O.2d 499, 345 N.E.2d 407. The secretary suggests that this statement in *Maloney* assumes that this constitutional provision applies when a bill is presented to the governor *before* the General Assembly's adjournment sine die.

{¶ 46} *Maloney,* however, did not address the question of how to count the ten-day period when adjournment precedes presentment. In *Maloney,* the governor had signed the bill. Cf. Section 16, Article II ("If the governor approves an act, he shall sign it, it becomes law and he shall file it with the secretary of state"). Accordingly, this statement in *Maloney,* which was not essential to the case's holding, does not support the secretary's argument.

B

{¶ 47} It has been suggested that requiring the governor's written objections to a bill to be filed in the office of the secretary of state within ten days after the General Assembly's adjournment sine die could undermine the governor's ability to give full consideration to bills passed by the General Assembly at the end of a legislative session. However, we need not, and do not, decide the constitutional effect of a deliberate effort by the General Assembly to delay presentment of a bill for the purpose of reducing or eliminating a governor's ten-day period after adjournment to veto a bill. Here, it is undisputed that this bill was presented to the governor for his review on December 27, 2006. There is nothing in the record to suggest that the governor objected to the date on which the General Assembly presented the bill to him. Indeed, the clerk of the Senate states in his affidavit that "it was determined with Governor Taft's staff that [Am.Sub.S.B. No. 117] should be presented to Governor Taft on December 27, 2006." Accordingly, the facts here do not require us to consider whether the presentation of Am.Sub.S.B. No. 117 to the governor contravened Section 15(E), Article II.

{¶ 48} Although we decline to decide the issue because it is not necessary to the determination of this case, we note that the General Assembly does not have constitutional free rein to withhold a bill that it has enacted from timely

presentment to the governor. Section 15(E), Article II of the Ohio Constitution expressly requires the General Assembly to "present[ ] [the bill] *forthwith* to the governor for his approval." (Emphasis added.) This court has noted that the ordinary meaning of "forthwith" is "immediately," or "promptly," or "without delay." See, e.g., *Seger v. For Women, Inc.*, 110 Ohio St.3d 451, 2006-Ohio-4855, 854 N.E.2d 188, ¶ 9 (construing Civ.R. 4(A)). Ohio thus differs in that regard from other states whose constitutions do not or did not address the time during which the legislature must present bills to the governor. Cf. *Cenarrusa v. Andrus* (1978), 99 Idaho 404, 409, 582 P.2d 1082 ("There is no provision in our Constitution governing the time within which the legislature must present bills to the governor"); *People ex rel. Petersen v. Hughes* (1939), 372 Ill. 602, 610, 25 N.E.2d 75 ("The constitution contains no provision respecting the time within which the General Assembly shall present enacted bills to the Governor"). The concern expressed by those two cases and one of the dissenters herein—that the legislature would be able to defeat the governor's veto power "merely by delaying presentment beyond the time in which the governor could act"—is not present here. *Cenarrusa*, 99 Idaho at 409, 582 P.2d 1082.

{¶ 49} Accordingly, counting the Constitution's ten-day period from the General Assembly's adjournment sine die rather than from the date the General Assembly presented the bill to the governor does not sanction deliberate delay in presentment of legislation for the purpose of impeding a governor's ability to review bills.

## VI

{¶ 50} For the above reasons, the time during which the governor could file Am.Sub.S.B. No. 117 with his objections with the secretary of state expired, at the latest, on Saturday, January 6, 2007, and therefore, the purported January 8, 2007 veto by the successor governor was ineffective. On the basis of this determination, we need not address relators' alternative arguments in support of their request for relief.

{¶ 51} Accordingly, we grant a writ of mandamus to compel the secretary of state to treat Am.Sub.S.B. No. 117 as a validly enacted law and to fulfill all of the secretary's statutory duties concerning that law, including maintaining and preserving Am.Sub.S.B. No. 117 as filed by the governor with the secretary's office on January 5, 2007, making the law available to the director of the Legislative Service Commission so that codification duties with regard to newly enacted laws may be completed, and fulfilling each of the secretary's other statutory duties imposed by R.C. Chapter 149 with regard to Am.Sub.S.B. No. 117.

{¶ 52} The parties did not request a stay of the effective date of the law to allow for circulation of referendum petitions, and we express no opinion on whether a stay may be permissible. Accordingly, Section 1c, Article II of the Ohio Constitution provides for the effective date of Am.Sub.S.B. No. 117.

Writ granted.

MOYER, C.J., LUNDBERG STRATTON and O'CONNOR, JJ., concur.

O'DONNELL, J., concurs in judgment.

PFEIFER and LANZINGER, JJ., dissent.

---

**LUNDBERG STRATTON, J., concurring.**

{¶ 53} I concur in the majority's holding that under Section 16, Article II of the Ohio Constitution, the ten-day period for the governor to act upon Am.Sub.S.B. No. 117 began to run on the date that the General Assembly adjourned sine die, December 26, 2006, and thus the time for the governor to act upon the bill expired, at the latest, on Saturday, January 6, 2007, and the attempted veto by the governor on Monday, January 8, 2007, was without effect. However, I write separately because I believe that the stronger and simpler position for invalidating the veto is to hold that when the governor decides to allow a bill to become law without his or her signature and files the bill without written objections with the secretary of state, the governor's constitutional authority over the bill terminates.

{¶ 54} Although "early versions of the Ohio Constitution severely restricted the governor's powers, * * * various constitutional amendments increased the power of the executive branch to achieve a rough equality with the other branches." *State ex rel. Dann v. Taft*, 109 Ohio St.3d 364, 2006-Ohio-1825, 848 N.E.2d 472, ¶ 54. One of these amendments is the 1903 amendment to Section 16, Article II, which gave the governor the power to veto legislation passed by the General Assembly. Id.; see, generally, Steinglass and Scarselli, The Ohio State Constitution: A Reference Guide (2004) 142, Section 16.

{¶ 55} In Ohio, "[e]very bill which has passed both houses of the general assembly shall be signed by the presiding officer of each house to certify that the procedural requirements for passage have been met and shall be presented forthwith to the governor for his approval." Section 15(E), Article II of the Ohio Constitution. Am.Sub.S.B. No. 117 was passed by both houses of the General Assembly, signed and certified by the presiding officer of each house, and presented to the governor for his approval.

{¶ 56} Under Section 16, Article II of the Ohio Constitution, I believe that the governor then had three different alternatives concerning Am.Sub.S.B. No. 117,

which is not a bill making an appropriation of money and was thus not susceptible to a line-item veto:

{¶ 57} "If the governor approves an act, he shall sign it, it becomes law and he shall file it with the secretary of state.

{¶ 58} "If he does not approve it, he shall return it with his objections in writing, to the house in which it originated, which shall enter the objections at large upon its journal, and may then reconsider the vote on its passage. * * *

{¶ 59} "If a bill is not returned by the governor within ten days, Sundays excepted, after being presented to him, it becomes law in like manner as if he had signed it, unless the general assembly by adjournment prevents its return; in which case, it becomes law unless, within ten days after such adjournment, it is filed by him, with his objections in writing, in the office of the secretary of state. *The governor shall file with the secretary of state every bill not returned by him to the house of origin that becomes law without his signature."* (Emphasis added.)

{¶ 60} "Generally speaking, in construing the Constitution, we apply the same rules of construction that we apply in construing statutes." *State v. Jackson,* 102 Ohio St.3d 380, 2004-Ohio-3206, 811 N.E.2d 68, ¶ 14. "In construing this language, we 'read words and phrases in context according to the rules of grammar and common usage.'" *Smith v. Leis,* 106 Ohio St.3d 309, 2005-Ohio-5125, 835 N.E.2d 5, ¶ 62, quoting *State ex rel. Lee v. Karnes,* 103 Ohio St.3d 559, 2004-Ohio-5718, 817 N.E.2d 76, ¶ 23. "Where the language of a statute or constitutional provision is clear and unambiguous, it is the duty of courts to enforce the provision as written." *Rocky River v. State Emp. Relations Bd.* (1989), 43 Ohio St.3d 1, 15, 539 N.E.2d 103; *State ex rel. Maurer v. Sheward* (1994), 71 Ohio St.3d 513, 520–521, 644 N.E.2d 369 ("Where the meaning of a provision is clear on its face, we will not look beyond the provision in an attempt to divine what the drafters intended it to mean").

{¶ 61} In *Maloney v. Rhodes* (1976), 45 Ohio St.2d 319, 323–324, 74 O.O.2d 499, 345 N.E.2d 407, we recognized that this language is unambiguous insofar as it sets forth three alternatives for the governor upon being presented a bill by the General Assembly:

{¶ 62} "The language of the Constitution is unmistakably clear that the Governor, who is the head of the executive department of government, Section 1, Article III, Ohio Constitution, has but three options with regard to bills sent to him for signature. (1) He may sign if he approves the bill, in which case he is required to file the law with the Secretary of State; (2) he may veto [the bill] if he disapproves [of it], in which case he is required to return it with his objections to the house of the General Assembly in which it originated; (3) he may refuse to sign or veto the bill, in which case at the end of ten days after the bill was

presented to him[,] it becomes law (unless the General Assembly adjourns within the ten day period) and he is required to file it with the Secretary of State. If the General Assembly adjourns within the ten day period, it becomes law unless the Governor, within ten days of the adjournment, files it with his objections in writing in the office of the Secretary of State. The Governor is required to file with the Secretary of State every bill which becomes law without his signature."

{¶ 63} Therefore, in my view, under Section 16, Article II, the governor has three options for bills presented by the General Assembly for consideration. The governor may (1) approve the bill by signing it, (2) veto the bill, or (3) refuse to sign or veto the bill. Relators assert that once the predecessor governor decided that the bill would become law without his signature under the third alternative specified in Section 16, Article II and effectuated that decision by filing the unsigned bill with the secretary of state, any executive authority over the bill was completed and could not be resurrected.

{¶ 64} It is well settled that once an executive power has been completely exercised, the authority of the executive to rescind the completed exercise of that power ceases. See, e.g., *Marbury v. Madison* (1803), 5 U.S. (1 Cranch) 137, 157, 2 L.Ed. 60 ("Some point of time must be taken when the power of the executive over an officer, not removable at his will, must cease. That point of time must be when the constitutional power of appointment has been exercised. And this power has been exercised when the last act, required from the person possessing the power, has been performed"); *Cook v. Botelho* (Alaska 1996), 921 P.2d 1126, 1129 ("The governor's power to reconsider Cook's appointment ended when the governor committed the last act required to complete the executive function of appointment"); *Royster v. Brock* (1935), 258 Ky. 146, 151–152, 79 S.W.2d 707 (action of acting governor in calling extraordinary legislative session could not be revoked by governor once acting governor has completed last act to be performed by him to exercise the executive power).

{¶ 65} This rule, I believe, is equally applicable to a governor's decision on whether to approve a bill. See, e.g., *People ex rel. Partello v. McCullough* (1904), 210 Ill. 488, 498, 71 N.E. 602 ("if, in the case at bar, the Governor himself, or through any one of his secretaries or clerks, deposited this bill in the office of the Secretary of State with his approval indorsed upon it and signed by himself, it thereby passed beyond his control, and he had no power thereafter to take the bill from the office of the Secretary of State, and veto it, and return it to the Secretary of State's office, accompanied by his veto").

{¶ 66} As explained by the Arkansas Supreme Court in *Powell v. Hayes* (1907), 83 Ark. 448, 463–464, 104 S.W. 177, in rejecting an argument that the governor could rescind his predecessor's approval of a bill, once the governor exercises his power over the bill by deciding to approve or veto it, neither he nor a successor

governor may reconsider that decision even if the constitutional period for such consideration has not elapsed:

{¶ 67} "It has been forcibly argued that each house of the General Assembly may reconsider bills acted upon by it, and the judiciary may grant rehearings and new trials, and reconsider decisions rendered by it, and that the same privilege should be accorded to the Executive, the other co-ordinate department of the government. But all these powers must be exercised within the limits prescribed by law. * * *

{¶ 68} "The houses of the General Assembly may, under the rules fixed and determined by them, allow a bill to be reconsidered, and individual members may change their minds upon the merits of the bill, and vote according to their change. But when the houses have exhausted this power of reconsideration, and the bill has passed the point where the law allows it to be reconsidered, then it is final, and it is not within the power of the General Assembly to recall it.

{¶ 69} "Courts may reconsider their decisions within fixed times, and judges may change their minds and render other decisions fitting to the change of opinion. But when the time for the reconsideration of a case has passed, and the term expired over which the court may control its judgment, then its action has become final and can not be changed. * * *

{¶ 70} "*And so it is with the Executive. He may, within the time prescribed by the Constitution, consider and reconsider a measure. He may change and rechange his mind upon the merits of a bill before him. But when he has exercised his power over it, either by approval or veto, then the action is final and irrevocable, and, like the judgment of a court when the time for reconsideration has passed, it is binding and unchangeable by the judge rendering it or any successor in office. The law has given him in one case 5 days, and in the other 20 days, for consideration; and when that consideration has been given, when that discretion has been exercised, when the last act has been performed, and the bill is signed, then the bill is a law and no more subject to veto than any other valid law.*" (Emphasis added.)

{¶ 71} As previously discussed, Section 16, Article II gives the governor three options: (1) approve the bill, (2) veto it, or (3) allow it to become law without the governor's signature. If the governor approves the act by signing it, "it becomes law and he shall file it with the secretary of state." Section 16, Article II, Ohio Constitution. Therefore, once the governor signs a bill, it becomes law, and the governor lacks authority to reconsider the bill. See, e.g., *Maloney*, 45 Ohio St.2d at 324, 74 O.O.2d 499, 345 N.E.2d 407 (a "successor Governor is constitutionally obligated to present to the Secretary of State a law timely signed by his duly elected and qualified predecessor"). Likewise, if a governor vetoes a bill by timely submitting his objections to the appropriate entity, he is not authorized to

reconsider his decision to veto the bill. *Woessner v. Bullock* (1911), 176 Ind. 166, 93 N.E. 1057.

{¶ 72} Similarly, if the governor decides—as here—to exercise his authority under the third option provided by Section 16, Article II by allowing the bill to become law without his signature and refusing to sign or veto the bill, the governor effectuates that decision by filing the unsigned bill with the secretary of state. See Section 16, Article II, Ohio Constitution ("The governor shall file with the secretary of state every bill not returned by him to the house of origin that becomes law without his signature").

{¶ 73} Here, it is uncontroverted that the predecessor governor exercised his authority under Section 16, Article II by deciding to allow the bill to become law without his signature and complied with Section 16, Article II by filing Am.Sub. S.B. No. 117 with the secretary of state. This is the only act required by the Constitution for a governor choosing this alternative, and the governor performed that act. Once he did so, in my view, the governor's authority over the bill ended, even assuming that the secretary is correct that the period for executive consideration of the bill had not. Cf., e.g., *Woessner*, 176 Ind. at 170, 93 N.E. 1057 ("The Constitution requires the concurring acts of the two Houses of the Assembly, and of the Governor in approving, or determining to withhold his approval, in the manner pointed out. When the Governor files such bill in the office of the Secretary of State, his power over it ends"); *People ex rel. Lanphier v. Hatch* (1857), 19 Ill. 283, 287 ("had [the governor] deposited the law, with his approval upon it, with the Secretary of State, then it would have passed beyond his control and its *status* would have become fixed and unalterable, * * * although his approval may have been signified by mistake" (emphasis sic)).

{¶ 74} The secretary of state contends that filing the unsigned bill should not be accorded the same constitutional significance as signing or vetoing a bill because it is the governor's inaction through the expiration of time rather than any action of the governor that makes the bill become a law under the third option specified in Section 16, Article II. See *State v. Lathrop* (1915), 93 Ohio St. 79, 84, 112 N.E. 209 ("Approval by the executive is unnecessary to give force and effect to a law, since [Section 16, Article II] of the constitution provides that if a bill be not returned by the governor within ten days after being presented to him, it shall become a law in like manner as if he had signed it").

{¶ 75} But the governor is free to decide which of the three options is preferable and to exercise the executive power required to exhaust that authority before the period of time for consideration has expired. See *Hunt v. State* (1904), 72 Ark. 241, 250, 79 S.W. 769 ("The five days allowed the Governor for the consideration of bills presented to him for approval or disapproval is a matter of privilege with him, until the same shall lapse, when the bills become laws. He

can, of course, waive the time, and notify the proper house, that the bill may become a law without his signature"); *State v. Heston* (1952), 137 W.Va. 375, 396, 71 S.E.2d 481, citing *Hunt,* for the proposition that "the designated period of time within which the Governor may return a bill with his disapproval after it is presented to him, being a privilege accorded to enable him to consider it, may be shortened by him and the bill returned before the expiration of such period."

{¶ 76} The predecessor governor decided to let Am.Sub.S.B. No. 117 become law without his signature and performed the only act he was required by the Constitution to do regarding this option by filing the unsigned bill with the secretary of state. By doing so, he relinquished control over the bill. Until he did so, assuming that the period of time for him to consider the bill had not expired, he could have changed his mind and either signed or vetoed the bill. But, in my view, after he filed the bill with the secretary of state, his authority over the bill ended and neither he nor a successor governor could retrieve the bill and act upon it.

{¶ 77} Moreover, in my view, the act of filing a bill with the secretary of state has constitutional significance. With certain exceptions, "acts go into effect 90 days after the same have been filed with the secretary of state, regardless of the date of approval by the Governor." *Lathrop,* 93 Ohio St. 79, 112 N.E. 209, paragraph one of the syllabus; Section 1c, Article II, Ohio Constitution ("No law passed by the general assembly shall go into effect until ninety days after it shall have been filed by the governor in the office of the secretary of state, except as herein provided"). The filing date also begins the 90–day period within which electors can submit a referendum petition to challenge laws enacted by the General Assembly. Section 1c, Article II, Ohio Constitution.

{¶ 78} Moreover, I would hold that the secretary of state lacked authority to transmit the bill to the governor based upon the secretary's judicial determination that the bill was not a law. "The Secretary of State is an executive officer who is not vested with any jurisdiction to determine judicial questions dealing with the constitutionality of any law." *Maloney,* 45 Ohio St.2d 319, 74 O.O.2d 499, 345 N.E.2d 407, paragraph two of the syllabus. The secretary of state "exercises no judicial or quasi-judicial authority over" bills filed with her. *State ex rel. Governor v. Taft* (1994), 71 Ohio St.3d 1, 4, 640 N.E.2d 1136. This is not one of the limited areas in which the secretary of state is authorized to exercise quasi-judicial authority. Cf. *State ex rel. Patton v. Myers* (1933), 127 Ohio St. 169, 187 N.E. 241 (secretary of state exercises quasi-judicial power when determining the sufficiency of referendum petitions).

{¶ 79} The secretary of state does not disagree with this precedent. Instead, the secretary asserts that in transmitting Am.Sub.S.B. No. 117 to the governor, she acted in a ministerial manner because she "refrained from making a

determination whether the Governor's request was still within his [constitutionally prescribed] ten-day time period." But the secretary of state's own response to the governor's request, which accompanied the secretary's January 8 transmittal of Am.Sub.S.B. No. 117 to the governor, contradicts that assertion:

{¶ 80} "Nothing in law prohibits the Secretary of State from returning to the governor an act that has been filed with the office without signature, *but which has not yet become law.*

{¶ 81} "Therefore, I am returning herewith Am.Sub.S.B. No. 117 to you, in accordance with your request, *to allow you to determine within the Constitutional ten-day period* which option you determine best in regard to the final disposition of Am.Sub.S.B. No. 117." (Emphasis added.)

{¶ 82} Consequently, I believe that the secretary of state exceeded her ministerial authority by making a judicial determination that the governor was entitled to the bill because it had "not yet become law." See *Maloney,* 45 Ohio St.2d 319, 74 O.O.2d 499, 345 N.E.2d 407, paragraph two of the syllabus; *State ex rel. Governor v. Taft* (1994), 71 Ohio St.3d 1, 4, 640 N.E.2d 1136.

{¶ 83} Based on the foregoing, while I concur in the majority opinion, I would also hold, because I believe that it is the stronger and simpler position, that when the governor decided to allow Am.Sub.S.B. No. 117 to become law without his signature and filed the bill with the secretary of state, the governor lacked authority to thereafter elect a different option under Section 16, Article II, and the secretary of state lacked authority to make a judicial determination that the bill had not yet become law and to transmit the bill to the governor for further consideration. Therefore, I believe that the veto is ineffective and that Am.Sub. S.B. No. 117 is a valid law subject to the referendum process.

---

O'CONNOR, J., concurring.

{¶ 84} I concur fully in the majority opinion. I am compelled to write separately, and reluctantly, in response to Justice Pfeifer's dissent. I do so not to quibble with the legal and logical shortcomings of his opinion, but in defense against his improper accusation that the majority has not decided this case of first impression with honesty and integrity.

{¶ 85} There is room in any great institution for vigorous debate. As Lord Attlee once said to Winston Churchill, "A monologue is not a decision."

{¶ 86} Disagreement among justices of this court is to be expected and is desired. We are challenged by the cases before us for the very reason that exists here: there is no one clear, easy answer to the problem presented. It is the

court's responsibility to collect and consider the differing viewpoints and opinions presented and, when possible, to reach consensus in a decision that will serve as precedent for all of our courts.

{¶ 87} When judges and justices engage in robust discussion in furtherance of the search for consensus, we are rightfully expected by the people who elect us to act with respect and courtesy. In turn, we have often called upon attorneys to practice their profession with civility. Although civility is an amorphous concept in legal arenas, at a minimum it suggests proceeding without insult and ad hominem attacks when discussing those who hold an opposite view. Unfortunately, Justice Pfeifer disregards the same civility he once espoused[7] in favor of a dissent filled with sarcastic scurrility.

{¶ 88} The dissent states that our holding in this case was reached in a result-driven process that was started on the day the case was argued and that has been fueled by political considerations since then. Nothing could be further from the truth.

{¶ 89} As the dissenter knows, our internal debate on this matter has been extensive. The outcome in this case was not preordained.

{¶ 90} As the dissenter knows, I, and at least one other member of this court, gave careful consideration to a former draft of an opinion he circulated more than ten weeks ago, notwithstanding its vitriolic invective. The fact that five separate opinions have been written on the merits of the claims raised here suggests, quite strongly, that the members of this court are not of one mind—or persuasion.

{¶ 91} As the dissenter knows, the majority opinion is one that eventually garnered sufficient support to form a consensus. It is authored by a former legislator who served with the dissenting justice in the General Assembly. Justice Cupp, like Justice Pfeifer, understands firsthand the legislature's workings—and its failings. The fact that two men of not dissimilar backgrounds might disagree about the proper outcome of this case is not distressing. To the contrary, it is encouraging. But for one to suggest that the other's differing decision was driven by politics rather than careful consideration of Ohio's Constitution and case law is disheartening and disrespectful.

{¶ 92} I have had many disagreements with my colleagues about the scope and proper application of the law, as even casual review of our precedent makes clear. Justice Pfeifer and I agree from time to time, but we often find ourselves at odds in the resolution of the cases we hear. Despite those disagreements, I, until

---

7. "My colleagues on the Supreme Court and I discuss this issue frequently. We agree lawyers ought to be the leaders in civility; instead, we see a deterioration of common decency in the profession." Paul E. Pfeifer, Civility in Practice (Sept. 19, 1998), found at http://www.smartvoter. org /1998nov/oh/hm/vote/pfeifer_p/paper3.html.

today, had maintained the appropriate respect for any position maintained by Justice Pfeifer.

{¶ 93} Each justice takes an oath to fulfill that duty to the best of his or her ability. To wrongly call into question the integrity of justices with opposing views maligns our personal and professional reputations, including that of the dissenting justice. Most offensively, however, it undermines the integrity of the court itself.

{¶ 94} To disparage the members of the court with the dishonest suggestion of political expedience is disheartening personally, but more important, it is a professional disservice to the parties and institutions involved and to the people of Ohio. Justice Pfeifer's dissent is incorrect insofar as it states that real damage has been done to the Ohio Constitution. More correctly, the real damage has been done to the perception of the judiciary's integrity. I am left to wonder if he understands that it is his words that have inflicted the "ironic and dispiriting" damage.

---

O'DONNELL, J., concurring in judgment.

{¶ 95} This case is one of a constitutional magnitude, in which the Supreme Court of Ohio is called upon to define and clarify the responsibilities and duties of the offices of governor and secretary of state with respect to legislation enacted by the Ohio General Assembly. This case directly concerns both the authority of a governor to seek return of a bill previously delivered to and filed with the secretary of state's office and the authority of the secretary of state to redeliver such a bill to the governor's office. I concur with the judgment of the majority but for a different reason and, therefore, write separately to emphasize that the Constitution does not permit either public official to undertake these actions.

*The Governor Lacks Authority to Recall a Bill Previously Filed*

{¶ 96} As both the majority and the dissent acknowledge, and as this court has previously stated in *Maloney v. Rhodes* (1976), 45 Ohio St.2d 319, 323, 74 O.O.2d 499, 345 N.E.2d 407, "the Governor * * * has but three options with regard to bills sent to him for signature." Section 16, Article II of the Ohio Constitution specifies that the governor may (1) approve the bill, (2) veto the bill, or (3) allow the bill to become law without gubernatorial approval. Id. at 323–324, 74 O.O.2d 499, 345 N.E.2d 407. Furthermore, this court has held that the governor "has only the executive power to sign, veto, or refuse to sign or veto, and the *constitutional obligation* to file the law or bill either with the Secretary of State or the house where the bill originated." (Emphasis added.) Id. at 324, 74 O.O.2d

499, 345 N.E.2d 407, citing *State ex rel. Marcolin v. Smith* (1922), 105 Ohio St. 570, 138 N.E. 881. Moreover, "[t]he Governor is required to file with the Secretary of State every bill which becomes law without his signature." Id.; see, also, Section 16, Article II, Ohio Constitution.

{¶ 97} The attorney general argues that the governor's act of filing a bill with the secretary of state's office does not transform it into a law and that, therefore, the act of filing has no constitutional significance. It is true that an unsigned bill does not become law upon filing with the secretary of state, but that does not mean that the act of filing has no legal significance. It is the act of filing with the secretary of state that triggers constitutional provisions regarding the referendum process and the 90–day waiting period for legislation to become effective. See Section 1c, Article II, Ohio Constitution.

{¶ 98} Importantly, however, the filing of a bill with the secretary of state is the governor's performance of a constitutional obligation and the last act that the Constitution authorizes a governor to take in the process by which a bill becomes a law without his signature. Upon completing review of the legislation and filing it without signature in the office of the secretary of state, the governor's constitutional obligations are fulfilled, and, as this court stated 170 years ago in *Doe v. Dugan's Exrs.* (1837), 8 Ohio 87, 107, "[i]t is not competent for a public officer to undo what he has once done, and thus correct his errors; when he has executed his duties, he is *functus officio,* and has lost his power over the subject." "Functus officio" means "having performed his or her office," which in turn means that the public officer is "without further authority or legal competence because the duties and functions of the original commission have been fully accomplished." Black's Law Dictionary (8th Ed.2004) 696.

{¶ 99} In this case, the General Assembly presented Am.Sub.S.B. No. 117 to Governor Taft, who considered the bill, publicly stated his intention that it become law without his signature, and acted upon that intent by delivering the bill and filing it with the secretary of state in conformity with Section 16, Article II of the Ohio Constitution. It is of no legal significance that the bill did not become law at the moment of filing; that is irrelevant. The legal significance is that the governor decided to permit the bill to become law without signature in conformity with constitutional authority, acted upon that decision by filing the bill in the office of the secretary of state, and completed a constitutional function in the legislative process. It is my view that the act of filing with the secretary of state terminated the function of the office of governor with respect to this legislation.

*The Secretary of State Lacks Authority to Return a Bill Previously Filed*

{¶ 100} Pursuant to the Constitution, the office of the secretary of state has no role in the legislative process other than to serve as a depository for the filing of bills and laws. As we have explained in *Maloney*:

{¶ 101} "The language of Section 16, Article II of the Constitution is unmistakably clear.

{¶ 102} "The Secretary of State has no option. The Secretary of State is obligated by the Constitution and his oath of office to file the law when it is presented to him for filing. *It is a ministerial act. It is not discretionary."* (Emphasis added.) Id. at 322, 74 O.O.2d 499, 345 N.E.2d 407, citing *Marcolin*, 105 Ohio St. 570, 138 N.E. 881.

{¶ 103} Once a bill is filed, the obligation of the secretary of state is set forth by R.C. 111.08, which states: "The secretary of state shall have charge of and safely keep the laws and resolutions passed by the general assembly and such other papers and documents as are required to be deposited in his office." The Revised Code also mandates that the secretary of state perform several tasks concerning bills and laws that have been filed in that office. See, e.g., R.C. 149.08 ("Within sixty days after each engrossed bill is filed with the secretary of state, he shall forward a copy of each such law to each clerk of the court of common pleas"), R.C. 149.09 (distribution of pamphlet laws), and R.C. 149.091 (distribution and publication of session laws).

{¶ 104} These duties are no less ministerial than the act of receiving a filing from the governor's office, and, pursuant to our decision in *Maloney*, a "ministerial act" is " '[o]ne which a person performs in a given state of facts in a prescribed manner in obedience to the mandate of legal authority, without regard to or the exercise of his own judgment upon the propriety of the act being done.' " 45 Ohio St.2d at 323, 74 O.O.2d 499, 345 N.E.2d 407, quoting Black's Law Dictionary (4th Ed.1968) 1148.

{¶ 105} Thus, the Constitution and the Revised Code charge the secretary of state with the ministerial tasks of accepting legislation for filing, safely keeping it, publishing it, and distributing it to various public offices. These responsibilities preclude remitting a filed document to the office from which it was submitted. Analogous situations exist with respect to other governmental offices; for example, a clerk of courts has no authority to simply return a complaint that has been filed with the court by a claimant. See R.C. Chapter 2303. Further, a county recorder may not simply return a deed, mortgage, or lien to the party that caused it to be recorded. See R.C. Chapter 317. Nor may a board of elections return nominating petitions to candidates for public office who have filed them and later seek to withdraw them for resubmission. See *State ex rel. Canales–Flores v. Lucas Cty. Bd. of Elections*, 108 Ohio St.3d 129, 2005-Ohio-5642, 841 N.E.2d 757. In these instances, just as with the secretary of state, the law charges the clerk, the recorder, and the board of elections with the ministerial acts of receiving, making, and preserving the appropriate records.

{¶ 106} Nothing in the Constitution, the Revised Code, or the precedent of this court suggests that a secretary of state has the authority or discretion to make any determination with respect to legislation or the actions of either the governor or the General Assembly in the legislative process. And there exists nothing that authorizes a secretary of state to return, remit, or otherwise redeliver a bill that has been accepted for filing.

{¶ 107} In the instant case, the secretary of state received and filed Am.Sub. S.B. No. 117 in conformity with the Ohio Constitution. When Governor Strickland assumed office and thereafter requested that this bill be returned to his office, the secretary of state lacked any authority whatsoever to comply with that request. Because the Ohio Constitution uses the date of the filing with the secretary of state to commence the time for filing a referendum petition and to commence the time for determining the effective date of legislation, and because no constitutional or statutory authority exists to permit the secretary of state to remit a bill or law to the governor's office, I am of the view that the secretary of state lacks the discretion to exercise such authority.

{¶ 108} Furthermore, as the law charges the secretary of state with "safely keep[ing] the laws and resolutions passed by the general assembly and such other papers and documents as are required to be deposited in his office" (R.C. 111.08), the act of remitting such a document to the office that had submitted it is inconsistent with the Constitution and the oath of office.

{¶ 109} The differing viewpoints expressed in the majority and dissenting opinions address only the counting and commencement of the ten-day period for gubernatorial action on a bill delivered to the governor by the legislature. They do not confront the fact that, here, the governor acted upon Am.Sub.S.B. No. 117, transmitted it to and filed it with the secretary of state, placing it outside the purview of the governor's office, and, having done so, completed his function and thereby terminated his role with respect to the legislation. The governor, therefore, is precluded from retrieving the bill and acting on it a second time.

{¶ 110} For these reasons, I concur with the judgment of the majority that a writ of mandamus should issue ordering the secretary of state to act upon Am.Sub.S.B. No. 117 as it had been originally filed by then Governor Taft.

---

PFEIFER, J., dissenting.

{¶ 111} The foot-dragging of the General Assembly at the end of its term and the Pilate-like inaction of Governor Bob Taft have left the majority with the dirty work of finding some way to resuscitate Am.Sub.S.B. No. 117. Seemingly

forgetting that this court's obligation is to interpret and uphold the Ohio Constitution—not to fix the mistakes of the other branches of government—the majority renders Section 16, Article II of the Ohio Constitution an absurdity, striking a harmful blow to the separation of powers. The majority today allows the General Assembly, through the manipulation of its adjournment, to effectively render a governor's veto power a nullity. While the failures of the General Assembly and former governor to constitutionally enact Am.Sub.S.B. No. 117 could be attributed to mistake or oversight, this court's action today is willful and made with full recognition of its lasting impact on our Constitution and this institution. The majority defies common sense, the Ohio Constitution, the jurisprudence of the United States Supreme Court and the supreme courts of other states, and this court's own prior "unmistakably clear" interpretation of the very same constitutional provision that is at issue today. The majority has achieved a new level of judicial activism—a wholesale rewriting of the Ohio Constitution. And all the General Assembly had to do was ask.

{¶ 112} This court has neither the obligation nor the ability to save the General Assembly from itself or to rework the Ohio Constitution to do so. It is not our problem that the General Assembly presented Am.Sub.S.B. No. 117 to then Governor Taft less than ten days before the end of his term, 13 days after it was passed. It is not our problem that the bill was met with ambivalence by Governor Taft and was rejected by Governor Strickland. The General Assembly could have secured the passage of Am.Sub.S.B. No. 117 through three means pursuant to Section 16, Article II of the Ohio Constitution: (1) it could have presented Governor Taft with a version of Am.Sub.S.B. No. 117 that he was willing to sign; (2) had Governor Taft vetoed the bill, it could have overridden that veto; (3) it could have presented the bill to Governor Taft more than ten days prior to the start of Governor Strickland's term, and Governor Taft's failure to act upon it would have resulted in its becoming law. The General Assembly did none of these things.

{¶ 113} Because the General Assembly failed to enact Am.Sub.S.B. No. 117 through the means set forth in the Ohio Constitution, relators now ask this court to distort the Ohio Constitution beyond recognition to achieve the result they desire. That relators make the request can be excused; that this court grants it cannot.

{¶ 114} "Generally speaking, in construing the Constitution, we apply the same rules of construction that we apply in construing statutes." *State v. Jackson,* 102 Ohio St.3d 380, 2004-Ohio-3206, 811 N.E.2d 68, ¶ 14. It is a cardinal rule of statutory construction that a statute should not be interpreted to yield an absurd result. *State ex rel. Dispatch Printing Co. v. Wells* (1985), 18 Ohio St.3d 382, 384, 18 OBR 437, 481 N.E.2d 632. The same thus follows for this court's

interpretation of the Ohio Constitution. The majority has violated this court's cardinal rule.

{¶ 115} The majority opinion holds that it is the date of adjournment of the General Assembly that starts the time period an Ohio governor has to review a bill and sign or veto it before it becomes law. The amount of time the governor actually *has* the bill becomes of no significance. The General Assembly can thus eliminate entirely a governor's veto by waiting until ten days after adjournment to present a passed bill to the governor. Through its decision today, the majority reveals that it is the General Assembly's schedule, not the Ohio Constitution, that controls the governor's veto power.

{¶ 116} In this case, the General Assembly did not present the bill to Governor Taft until 13 days after it had passed. Pursuant to the majority's holding, had the General Assembly adjourned on the day of passage, Am.Sub.S.B. No. 117 would have become law three days before presentment. Had the General Assembly only known then of the hidden constitutional treasure the majority conjures up today, it could have avoided this whole lawsuit. Certainly, today's opinion will be useful to the General Assembly in the future, especially when the governor is from an opposing political party.

{¶ 117} And to think that before today, no one knew of this power. Nearly 100 years under this version of the Ohio Constitution passed before the wisdom of the majority revealed the hidden code within Section 16, Article II—the General Assembly rules!

{¶ 118} The majority seems a little uneasy with the power it has given the General Assembly and meekly offers Section 15(E), Article II as a sort of Band-Aid for the gaping hole it has created in the Constitution. The majority says that Section 15(E) requires the General Assembly to present the bill "forthwith" to the governor for his approval and declares that that clause should prevent legislative loitering. The majority declines to consider whether the General Assembly complied with Section 15(E) in this case because Governor Taft never complained about the time lag. Of course, Section 15(E) does not contain an "unless the governor doesn't complain" exception. Section 15(E), Article II states:

{¶ 119} "Every bill which has passed both houses of the general assembly shall be signed by the presiding officer of each house to certify that the procedural requirements for passage have been met and shall be presented forthwith to the governor for his approval."

{¶ 120} The "forthwith" requirement of Section 15(E) arises not after the bill is passed by the General Assembly, but after the presiding officer of each house certifies that the procedural requirements for passage have been met. Relators here claim that that certification occurred on December 26, 12 days after the

passage of the bill. Nothing in the Constitution states that the certification must occur concomitantly with passage or that certification cannot be made after adjournment. Thus, Section 15(E) does nothing to save the Ohio Constitution from the mess the majority creates.

{¶ 121} Instead, Section 15(E), Article II is in direct conflict with the majority's interpretation of Section 16, Article II. Section 15(E) states that the presiding officers of the General Assembly shall certify the bills and that the bills "shall be *presented* forthwith to the governor *for his approval*." (Emphasis added.) Section 15(E) requires the presentment of passed bills so that the governor may have the opportunity to approve (or disapprove) the bills presented. Presentment cannot be made without the governor's obtaining some power over the bill. Under the majority opinion, presentment can be made ten days after adjournment, at which time the governor would be powerless to exercise his veto. The majority's interpretation of Section 16, Article II cannot coexist with Section 15(E).

{¶ 122} A reasonable reading of Section 16, Article II measures the governor's veto period from the date of presentment, with an additional ten-day consideration period added when the General Assembly adjourns before the first ten days expire. That interpretation always leaves the governor with at least ten days to consider a bill. But the majority has foresworn reasonableness. Instead, the majority has reinterpreted the Ohio Constitution to allow the General Assembly to destroy the governor's veto right. How can this have been avoided? By interpreting Section 16, Article II in a reasonable manner, in the manner it already has been interpreted by this court.

{¶ 123} In *Maloney v. Rhodes* (1976), 45 Ohio St.2d 319, 323–324, 74 O.O.2d 499, 345 N.E.2d 407, this court construed Section 16, Article II to give a governor no fewer than ten days to consider a bill after its presentment:

{¶ 124} "The language of the Constitution is unmistakably clear that the Governor, who is the head of the executive department of government, Section 1, Article III, Ohio Constitution, has but three options with regard to bills sent to him for signature. (1) He may sign if he approves the bill, in which case he is required to file the law with the Secretary of State; (2) he may veto if he disapproves the bill, in which case he is required to return it with his objections to the house of the General Assembly in which it originated; (3) he may refuse to sign or veto the bill, in which case *at the end of ten days after the bill was presented to him* it becomes law (unless the General Assembly adjourns *within the ten day period*) and he is required to file it with the Secretary of State. If the General Assembly adjourns *within the ten day period,* it becomes law unless the Governor, within ten days of the adjournment, files it with his objections in writing in the office of the Secretary of State. The Governor is required to file

with the Secretary of State every bill which becomes law without his signature."
(Emphasis added.)

{¶ 125} The court stated in *Maloney* that the "ten days after such adjourn-
ment" period for a bill to become law without the governor's signature would
apply only if adjournment occurred within the ten-day period after the governor
had been presented with the bill by the General Assembly. The majority
dismisses what the court wrote in *Maloney*, claiming that its interpretation of
Section 16, Article II was not essential to the holding of that case. It is true that
that above-cited portion of *Maloney* was dicta, but the fact that the court's
interpretation in that case was eminently reasonable and allows the Ohio Consti-
tution to function in a coherent manner cannot be dismissed.

{¶ 126} The basis of the ten-day consideration, and its importance to a
government with equal branches, was set forth by the United States Supreme
Court in *Okanogan Indian Tribes v. United States* (1929), 279 U.S. 655, 677–678,
49 S.Ct. 463, 73 L.Ed.2d 894 (*"The Pocket Veto Case"*). In that case, the court
analyzed Section 7, Article I of the United States Constitution in light of the
importance of the president's veto power and rejected a construction that would
allow Congress to shorten the prescribed period for the president to determine
whether to approve or disapprove a bill:

{¶ 127} "The Constitution in giving the President a qualified negative over
legislation—commonly called a veto—entrusts him with an authority and imposes
upon him an obligation that are of the highest importance, in the execution of
which it is made his duty not only to sign bills that he approves in order that they
may become law, but to return bills that he disapproves, with his objections, in
order that they may be reconsidered by Congress. The faithful and effective
exercise of this momentous duty necessarily requires time in which the President
may carefully examine and consider a bill and determine, after due deliberation,
whether he should approve or disapprove it, and if he disapproves it, formulate
his objections for the consideration of Congress. To that end a specified time is
given, after the bill has been presented to him, in which he may examine its
provisions and either approve it or return it, not approved, for reconsideration.
* * * The power thus conferred upon the President cannot be narrowed or cut
down by Congress, nor the time within which it is to be exercised lessened,
directly or indirectly. And it is just as essential a part of the constitutional
provisions, guarding against ill-considered and unwise legislation, that the Presi-
dent, on his part, should have the full time allowed him for determining whether
he should approve or disapprove a bill, and if disapproved, for adequately
formulating the objections that should be considered by Congress, as it is that
Congress, on its part, should have an opportunity to re-pass the bill over his
objections." (Footnotes omitted.)

{¶ 128} The court noted the importance of the veto time period where, as here, a flurry of bills descends upon the executive at the end of a legislative session: "It will frequently happen—especially when many bills are presented to the President near the close of a session, some of which are complicated or deal with questions of great moment—that when Congress adjourns before the time allowed for his consideration and action has expired, he will not have been able to determine whether some of them should be approved or disapproved, or, if disapproved, to formulate adequately the objections which should receive the consideration of Congress. And it is plain that when the adjournment of Congress prevents the return of a bill within the allotted time, the failure of the bill to become a law cannot properly be ascribed to the disapproval of the President—who presumably would have returned it before the adjournment if there had been sufficient time in which to complete his consideration and take such action—but is attributable solely to the action of Congress in adjourning before the time allowed the President for returning the bill had expired. Thus, in *La Abra Silver Mining Co. v. United States* [(1899), 175 U.S. 423, 454, 20 S.Ct. 168, 44 L.Ed. 223], this Court said that 'if by its action, after the presentation of a bill to the President during the time given him by the Constitution for an examination of its provisions and for approving it by his signature, Congress puts it out of his power to return it, not approved, within that time to the House in which it originated, then the bill fails, and does not become a law.' " *Pocket Veto Case*, 279 U.S. at 679, 49 S.Ct. 463, 73 L.Ed. 894.

{¶ 129} Similarly, in *Edwards v. United States* (1932), 286 U.S. 482, 52 S.Ct. 627, 76 L.Ed. 1239, the United States Supreme Court held that the president's approval of a bill within the constitutionally prescribed term of "ten Days (Sundays excepted)" after it was presented to him was sufficient to make the bill become law even though at the time the president approved it, Congress had adjourned for the session. The court so held notwithstanding the additional language in Section 7, Article I of the United States Constitution specifying that inaction of the president shall not result in the bill's becoming law when "the Congress by their Adjournment prevent [the bill's] Return." In so holding, the court emphasized that "[r]egard must be had to the fundamental purpose of the constitutional provision to provide appropriate opportunity for the President to consider the bills presented to him" and that "[n]o public interest would be conserved by the requirement of hurried and inconsiderate examination of bills in the closing hours of a session, with the result that bills may be approved which on further consideration would be disapproved or may fail although on such examination they might be found to deserve approval." Id. at 493–494, 52 S.Ct. 627, 76 L.Ed. 1239.

{¶ 130} The ten-day rule creates a time frame determined to be necessary by the founders for the executive to properly consider a bill, or a pile of bills, before

it becomes law. It is the lifeblood of the veto power, and thus of the separation of powers. It grounds the veto power in reality. With the ten-day rule, there can be no game-playing with the legislative calendar; the legislature cannot prevent the executive from ultimately having the opportunity to exercise his constitutional powers. No matter what the legislature does, the executive will get his chance to review the bill and potentially veto it.

{¶ 131} The ten-day time limit also works in favor of the legislature. The executive cannot slide the bill in a desk drawer until the end of his term, keeping it from becoming law. The executive must act, and the legislature still has the opportunity to override the executive's veto if it is still in session.

{¶ 132} But now, in Ohio, the governor's time for considering a bill gets reduced from ten days at the whim of the General Assembly—not in all instances, just in the most nonsensical instances. By the majority's reading of Section 16, Article II, if adjournment occurs after presentment, the governor gets an additional ten days from adjournment to consider the bill. However, if adjournment occurs before presentment, the date of adjournment starts the running of the ten-day period. Thus, adjournment has the effect of expanding or contracting the ten-day period, depending on when it occurs. The result is incongruous: If adjournment occurs after the governor has had at least some time to consider the bill, he gets even more time; if adjournment occurs before the governor has even seen the bill, he gets even less time to consider the bill.

{¶ 133} What could be the conceivable purpose of cutting short the time for a governor's consideration while the legislature is not in session? As read coherently, Section 16, Article II gives the governor more time to consider such bills. It expands the time normally given when time is no longer of the essence. The majority reading says that when time is absolutely not of the essence—after the legislature has adjourned—the Constitution works to cut short the governor's deliberation time. Why is the governor given less time for consideration of a bill when the General Assembly is not in place to override the veto? As the court said in *Edwards*, there is no conceivable reason:

{¶ 134} "No possible reason, either suggested by constitutional theory or based upon supposed policy, appears for a construction of the Constitution which would cut down the opportunity of the President to examine and approve bills merely because the Congress has adjourned." *Edwards*, 286 U.S. at 493, 52 S.Ct. 627, 76 L.Ed. 1239.

{¶ 135} The majority cites no authority from anywhere that supports its position. On the other hand, in cases directly on point, two other jurisdictions have held that when adjournment precedes presentment, the running of the ten-day rule begins at presentment rather than adjournment.

{¶ 136} In *People ex rel. Petersen v. Hughes* (1940), 372 Ill. 602, 25 N.E.2d 75, the relators similarly requested that the Illinois Supreme Court grant writs of mandamus to compel the Secretary of State of Illinois to certify and publish two bills as duly enacted laws on the basis that the Illinois governor's vetoes of these bills were not presented to the secretary within the constitutionally prescribed time following adjournment of the Illinois General Assembly. The state legislature had adjourned before presenting the bills to the governor, and the governor submitted the bills with his vetoes to the secretary of state within the applicable constitutional period after presentment, but not within ten days after the state legislature had adjourned.

{¶ 137} In resolving the mandamus claims, the Illinois Supreme Court interpreted the then applicable version of the Illinois Constitution, which provided in language nearly identical to Section 16, Article II of the Ohio Constitution:

{¶ 138} "Any bill which shall not be returned by the Governor within ten days (Sundays excepted) after it shall have been presented to him, shall become a law in like manner as if he had signed it; unless the General Assembly shall, by their adjournment, prevent its return, in which case it shall be filed with his objections in the office of the Secretary of State, within ten days after such adjournment, or become a law." Section 16, Article 5 of the Illinois Constitution of 1870.

{¶ 139} The Illinois Supreme Court denied the requested writs of mandamus and held that where the General Assembly had adjourned before presenting the bill to the governor, the governor was afforded the complete ten days, with Sundays excepted, from the date the bill was presented to him, to approve or disapprove the bill, instead of the shorter period of ten days from the date the legislature adjourned:

{¶ 140} "The purpose of granting the Chief Executive authority to approve or disapprove legislative matters was to enable him to prevent, as far as possible, the evils that flow from hasty and ill-considered legislation.

{¶ 141} " * * *

{¶ 142} " * * * The power of the General Assembly to authorize the presentment of a bill to the Governor after it has adjourned sine die, is inferior to the constitutional provision which places upon the Governor the duty to examine all bills, and which grants him ten days for consideration thereof in which to approve or disapprove.

{¶ 143} "It is common knowledge that, for many years, the General Assembly has followed the practice of passing many bills in the closing hours of the session. * * *

{¶ 144} " * * *

{¶ 145} "The constitutional provision granting the Governor ten days within which to approve or disapprove a bill and file the same if vetoed, must, as to all bills [presented to the Governor after the General Assembly has adjourned], be the ten days following presentment. * * * *[T]he provision for filing in the office of the Secretary of State within ten days after adjournment * * * can not be given an interpretation which will impair, or abridge, the time within which the Governor may exercise his veto power.* If the provision in reference to filing in the office of the Secretary of State within ten days after adjournment was to control, then we are forced to the adoption of one of two impossible constructions. One would impair the legislative power to fix the time of presentment, the other would lessen [or remove entirely] the period of time for the Governor's consideration of the matter * * *.

{¶ 146} " * * * *Any construction which reduces the ten-day period belonging to the Governor or imposes a duty upon the General Assembly to present all bills before the date of adjournment, would lead to the defeat of the benefits which the constitutional provision was intended to guarantee.*

{¶ 147} " * * *

{¶ 148} "The Governor's veto of [the two bills, which were submitted within the required time period following presentment] must be given effect, and the Secretary of State was right in not certifying either of them as duly enacted laws." (Emphasis added.) Id. at 607–613, 25 N.E.2d 75.

{¶ 149} Similarly, in *Cenarrusa v. Andrus* (1978), 99 Idaho 404, 582 P.2d 1082, the Idaho Supreme Court held that under its state Constitution, the governor had ten full days from the date of presentment in which to consider bills presented to him after adjournment of the legislature. The Idaho Supreme Court relied on the Illinois Supreme Court's decision in *Petersen* in so concluding. Id. at 408–409, 582 P.2d 1082. The Idaho Supreme Court also cited *Edwards*, 286 U.S. 482, 52 S.Ct. 627, 76 L.Ed. 1239, in support of its holding:

{¶ 150} "We full well realize that the Idaho constitutional provision, which requires an active veto to prevent a bill from becoming law after the legislature has adjourned, is quite different in operation from the federal 'pocket veto' provision. We nevertheless declare that the same fundamental purpose underlies the requirement of presentment found in both constitutions. *In this case the choice is between a construction of our constitutional language which would provide a definite amount of time for gubernatorial consideration of bills and one which would have the effect of allowing the legislature to determine the amount of time allowed to a governor, severely limiting it if the legislature so chose.* The reasoning of the Supreme Court in *Edwards* is readily applicable here." (Emphasis added.) *Cenarrusa*, 99 Idaho at 407–408, 582 P.2d 1082.

{¶ 151} The Idaho Supreme Court wrote that construing the Idaho Constitution to allow the legislature to control the amount of time a governor has to consider a bill offends the separation of powers:

{¶ 152} "If we were to hold that the governor was without power to veto a bill more than ten days after adjournment, the legislature would be in a position to defeat at will one of the constitutionally granted powers of a separate and coequal branch of government merely by delaying presentment beyond the time in which the governor could act. A construction of the Constitution which defeats the very purpose of allowing the governor an opportunity to consider the wisdom of a bill is to be avoided.

{¶ 153} "Furthermore, a construction placing the legislature in control of the time frame available to a governor for consideration of a bill can only lead to an undermining of the dignity of the position to which each of these two equal and coordinate branches of government are entitled in their transactions with each other." Id. at 409, 582 P.2d 1082.

{¶ 154} A leading treatise in considering the issue states that "[w]here presentment is allowed after adjournment it would seem that the [rule that the governor be permitted the full time after presentment to approve or disapprove a bill instead of the more limited time after adjournment] is more desirable as it allows the governor time to consider the bill. Where the period is measured from adjournment, delay in presentment may defeat the bill before there is opportunity for executive action." 1 Singer, Statutes and Statutory Construction (6th Ed.2002) 866, Section 16:5.

{¶ 155} Finally, as of January 8, 2007, the Legislative Service Commission, the nonpartisan research arm of the legislature, had listed on its Web site January 8 as the deadline for the governor to act on Am.Sub.S.B. No. 117 before it automatically became law. Of course, by Tuesday, January 9, that information had been erased from its Web site. Harris, Shift in Columbus Leaves Fast-Track Bill Derailed; Consumers Have Major Stake in Whether Veto Holds, Cleveland Plain Dealer (January 14, 2007) A1; Harris, Officials Counting to 10 Because of Veto Dispute, Cleveland Plain Dealer (January 10, 2007) C1.

{¶ 156} The gubernatorial veto power presently in place in Ohio emanates from the Constitutional Convention of 1912. The transcript from that convention reveals that the delegates knew that the General Assembly, if it adjourned sine die before the governor had had ten days to review any passed bills, was forfeiting its ability to overturn the governor's veto. One delegate, Mr. Doty of Cuyahoga County, who served as Clerk of the Ohio House of Representatives, referred to the veto power as absolute for half of the bills passed in Ohio, because that many were passed at the end of a legislative session, leaving the General Assembly powerless to override the veto:

{¶ 157} "MR. DOTY: [The governor has] an absolute veto on everything passed in the last few days of the general assembly, and that is nearly fifty per cent of the business done by the general assembly. I have stood at that desk and called sixty-six roll calls on sixty-six laws in one day. These laws go to the governor all at once and we adjourn and go home, and he can veto every one of them and we can't do a thing.

{¶ 158} " * * *

{¶ 159} " * * * I undertake to say to you that you cannot frame a veto that will not subject fifty per cent of the work of our legislature to an absolute veto and you can't help it.

{¶ 160} "MR. WORTHINGTON: Is there any reason why the legislature can't take a recess for ten days and then come back?

{¶ 161} "MR. DOTY: They can, but they don't.

{¶ 162} "MR. WORTHINGTON: Why don't they? What is the reason?

{¶ 163} "MR. DOTY: Simply because every preacher and reformer all over the state is writing the legislature within three days after they meet to adjourn. There must be a last day and they will pass everything on the last day, and then it has to go to the governor and there is an absolute veto on that.

{¶ 164} "MR. WORTHINGTON: But fifty per cent wouldn't come then on the last day if you pass the laws and then adjourn for ten days.

{¶ 165} "MR. DOTY: I am talking about the present practice.

{¶ 166} " * * *

{¶ 167} "MR. KNIGHT: If it be true that the general assembly had the power to recess for whatever number of days, three or ten, as the case may be, within which the governor has the right to exercise the veto power and they fail to take that recess and come back and pass on the bills that he did veto as they are permitted to do under the law, is it anybody's fault but the representatives of the people—the legislature—if a qualified veto is converted into an absolute veto?

{¶ 168} "MR. DOTY: No, sir; but if you have a practical way of doing it which will result in what I have said, what then?

{¶ 169} "MR. KNIGHT: Reform your legislature."

{¶ 170} 1 Proceedings and Debates of the Constitutional Convention of the State of Ohio (1913) 570–571.

{¶ 171} Since the genesis of the gubernatorial veto power in its present form in Ohio, it has been understood that presentment, not the General Assembly's adjournment, starts the clock on the governor's ten-day period to consider bills passed by the General Assembly, and that the General Assembly can preserve its ability to override the veto only by presenting bills to the governor ten days prior

to adjournment. Until today, the General Assembly has had to live with the consequences of its procrastination. Until today, its only solution was in Mr. Knight's admonition, "Reform your legislature." But now, there is a new solution: "Ask the Supreme Court to rewrite the Constitution."

{¶ 172} Nothing in the law supports the majority opinion's conclusion. Nothing in the majority opinion would convince an objective reader that the conclusion is just or in any way supported by case law, statutory law, learned treatises, or the plain language of Section 16, Article II of the Ohio Constitution.

{¶ 173} Why is the majority deciding this way today? I do not know. In the ultimate display of result-oriented justice, its reasoning shifts. From the day of oral argument, the unfolding of the majority opinion has been the story of a result in search of a justification and an author.

{¶ 174} Is the majority troubled by Governor Strickland identifying a loophole and bursting through it? Whether one considers Governor Strickland's veto gambit as clever or devious, whether one believes that vetoing legislation when the preceding governor has made it known that he wishes the legislation to become law without his signature is impertinent or tactical, the fact remains that his decision was hardball politics. Brilliant or backhanded, it was politics. And most importantly, it was constitutional.

{¶ 175} To judicially overturn the governor's veto in this case is undemocratic. Ohioans elected a new governor, one who opposed Am.Sub.S.B. No. 117 and could count to ten. On the day he became governor, he had the power to veto.

{¶ 176} Controversies like this are to be expected with shifts in the balance of power. The battles that ensue from those shifts are best fought by politicians. Today this court wades into politics and overreacts. At the end of the day, real damage has been done to the Ohio Constitution. That the damage is inflicted by this court is ironic and dispiriting.

---

LANZINGER, J., dissenting.

{¶ 177} As the separate opinions herein show, the constitutional provision that sets forth the governor's time frame for reviewing duly passed legislation is not clear in demanding a specific result. I conclude that the only two choices a governor has are to sign a bill or to veto a bill with his written objections; otherwise, a bill "becomes law in like manner as if [the governor] had signed it" only upon passage of ten days as the Constitution provides.

{¶ 178} The disputed portion of Section 16, Article II states: "If a bill is not returned by the governor within ten days, Sundays excepted, after being present-

ed to him, it becomes law in like manner as if he had signed it, *unless the general assembly by adjournment prevents its return; in which case, it becomes law unless, within ten days after such adjournment, it is filed by him, with his objections in writing, in the office of the secretary of state.* The governor shall file with the secretary of state every bill not returned by him to the house of origin that becomes law without his signature." (Emphasis added.)

{¶ 179} The majority states that this provision of Section 16, Article II "has two clauses: the first pertains to bills presented to the governor when the General Assembly remains in session, and the second applies when the General Assembly has adjourned sine die." Although it may seem plausible on first glance, on closer look, this interpretation is belied by the actual language in contention.

{¶ 180} Parsing the relevant sentence, we see that the time for review of legislation by a governor begins running on date of presentment, because a bill becomes law if it is not returned within ten days "after being presented to him." Contrary to the majority's view, the words "when the General Assembly remains in session" do not appear in Section 16. Instead, the sentence begins with the general rule: the ten days for a bill to become law without the governor's signature begin to run from the date of presentment. Sundays are not counted in calculating this time. The next clause, "unless the general assembly by adjournment prevents its return," sets up a condition that alternatively begins the time count with the date of adjournment. If the "adjournment prevents its return," the bill becomes law unless, within ten days after *such adjournment* (the "adjournment that prevents its return"), it is filed with the secretary of state.

{¶ 181} The majority states: "We have held that the reference in Section 16, Article II to 'adjournment' that 'prevents * * * return' of a bill means adjournment of the General Assembly sine die. *State ex rel. Gilmore v. Brown* (1983), 6 Ohio St.3d 39, 6 OBR 59, 451 N.E.2d 235." *Gilmore,* however, does not control here, for in *Gilmore,* the court merely considered the meaning of the term "adjournment" and held that a temporary recess did not qualify as such for purposes of Section 16. Id. at 40–41, 6 OBR 59, 451 N.E.2d 235. In *Gilmore,* we did not consider the issue of timing of the adjournment vis-a-vis presentment to determine the governor's authority to act on a bill.

{¶ 182} Relators and the majority focus solely on the fact of adjournment to contend that there is no difference in whether adjournment occurs before or after the presentment of a bill to the governor. Here, of course, the General Assembly adjourned sine die one day before the bill's presentment to Governor Taft. Nevertheless, the first "unless" clause suggests that the alternate beginning of the time count for gubernatorial review upon adjournment applies only when adjournment *follows* the date of presentment. An adjournment cannot "prevent

[a bill's] return" unless the bill is already presented, meaning it is in the hands of the governor. This language presumes that the governor has the bill in his possession and has the ability to act upon it. When adjournment occurs after presentment, extra time is allowed, because the time for review begins to tick anew on adjournment rather than presentment.

{¶ 183} Normally, the ten-day period for the governor's review begins at presentment. The specific exception that allows more time for review is the legislature's adjournment sine die after presentment. In that case, the adjournment "prevents [the bill's] return," and thus the ten-day period starts again from the date of adjournment. Under this interpretation, the governor always has ten days in which to fully review legislation that is presented to him and is given extra time if the legislature adjourns sine die during his review period. Otherwise, reading the time as relators suggest would mean that a governor will have fewer than ten days—if, as in this case, adjournment occurs before presentment.

{¶ 184} Am.Sub.S.B. No. 117 was presented to Governor Taft on December 27, 2006, the day after the General Assembly's adjournment. Therefore, the general rule applied, and the review period began on the day of presentment, in this case, a day after adjournment sine die. Because there were two intervening Sundays between the date of presentment and Governor Strickland's veto, Governor Strickland was authorized to take action to sign or veto the bill on January 8, 2007, as this was the tenth day from presentment.

{¶ 185} After a careful consideration of the text of Section 16, Article II of the Constitution, I must respectfully dissent from the majority's judgment granting the writ of mandamus.

---

Vorys, Sater, Seymour & Pease, L.L.P., Suzanne K. Richards, C. William O'Neill, and Richard D. Schuster, for relators.

Marc Dann, Attorney General, and Brian J. Laliberte, Michael W. Deemer, Frank M. Strigari, Pearl Chin, and Christopher R. Geidner, Assistant Attorneys General, for respondent.

Bricker & Eckler, L.L.P., Kurtis A. Tunnell, Anne Marie Sferra, and Maria J. Armstrong, urging granting of the writ for amici curiae Ohio Alliance for Civil Justice, Ohio Manufacturers' Association, Ohio Chamber of Commerce, National Federation of Independent Business/Ohio, Ohio Council of Retail Merchants, Ohio Business Roundtable, Ohio Chemistry Technology Council, and Ohio Automobile Dealers Association.

Marc Dann, Attorney General, and Kent Markus, Special Assistant Attorney General, urging denial of the writ for amicus curiae Governor Ted Strickland.

Daniel T. Kobil, Professor of Law, Capital University Law School, urging denial of the writ for amici curiae eighteen Ohio professors of constitutional law.

Benson A. Wolman, Susan B. Gellman, and Rachel K. Robinson, urging denial of the writ for amici curiae Equal Justice Foundation, Coalition on Homelessness and Housing in Ohio, AARP, National Association of Consumer Advocates, Ohio State Legal Services Association, Legal Aid Society of Cleveland, Legal Aid Society of Columbus, Miami Valley Fair Housing Center, Toledo Fair Housing Center, Northeast Ohio Coalition for the Homeless, Cleveland Tenants Organization, Advocates for Basic Legal Equality, Legal Aid of Western Ohio, and the Cuyahoga County Foreclosure Prevention Program.

Willis & Willis Co., L.P.A., and Todd L. Willis; McDowall Co., L.P.A., and Laura K. McDowall, urging denial of the writ for amicus curiae National Association of Consumer Advocates.